[No. 6462-6-II.   Division Two.   February 22, 1985.]

THE STATE OF WASHINGTON, *Respondent,* v. RICHARD WAYNE MANTHIE, *Appellant.*

*Richard Wayne Manthie,* pro se, and *Ronald D. Ness,* for appellant (appointed counsel for appeal).

*C. Danny Clem, Prosecuting Attorney,* and *Warren K. Sharpe, Deputy,* for respondent.

PETRICH, J.—The defendant, Richard Wayne Manthie, appeals from a conviction for aggravated first degree murder. He challenges the denial of a new trial because of prosecutorial misconduct as well as various evidentiary rulings and the giving of certain jury instructions.

The primary issue on appeal is whether the State intentionally created a situation likely to induce the defendant to make incriminating statements to a cellmate, thus effectively denying his right to counsel guaranteed by the Sixth Amendment.

We affirm.

On December 29, 1981, the lifeless body of William Edmondson was found lying facedown in a puddle of water in a remote, wooded area of Kitsap County. Edmondson had been shot in the head four times with .22 caliber bullets. The victim's body bore the markings of a severe assault. His chest had been "stomped in" resulting in broken ribs, a ruptured spleen and liver, a bruised heart, and a broken sternum. The small quantity of blood in the chest cavity indicated these injuries were inflicted after Edmondson's death. His nose was broken and the eyes and lips were swollen. He had been dead for several days before his body was found. The victim's wallet and a ring he normally wore were missing from the scene. Drag marks led directly from the body to a set of boot prints and tire tracks.

Edmondson had married the defendant's ex–wife, Rose Manthie Edmondson, on August 21, 1981. The next day Rose visited the defendant at the Montana State Prison where he was incarcerated. Edmondson's diary states that he suspected an attempt on his life on August 29, 1981. Rose again visited the defendant at the prison on September 12, 1981. On September 21, 1981, Rose initiated a

$150,000 life insurance policy for Edmondson and took steps to purchase a $60,000 home. During the first week of November 1981, Rose contacted Continental Life to obtain mortgage insurance for this home which would satisfy the mortgage on Edmondson's death. Edmondson chronicled a second fear of attempt on his life in his diary for November 13, 1981. On November 15, Rose again visited the defendant at prison. During this period of time, Rose actively supported the defendant's request for parole. She purchased his airline ticket for him when he was released from prison on December 17, 1981. With this ticket, the defendant flew to Seattle where he was met by Rose, spent the night with her in a hotel by Sea–Tac Airport, and then came to stay at Rose's separate residence, which was located near Long Lake (Long Lake residence). On December 21, the December premium for the $150,000 life insurance was paid.

Edmondson was last seen alive on December 21, 1981, departing in a 1973 orange–red Gremlin with his wife, Rose, from their newly purchased home. He did not show up for work on the following day. After finding his body on December 29, sheriffs contacted Rose and obtained her consent to search the Gremlin. They proceeded to her Long Lake residence where the Gremlin was located. There, they found the defendant. Searching the residence, detectives found the defendant's boots which matched the prints at the site where Edmondson's body was found, glass residue near a door which had recently been broken out, and droplets of blood on the floor. Inside the Gremlin, officers noticed a fresh smell of paint, and what appeared to be blood near the transmission hump in the vehicle's passenger compartment. A more thorough examination identified spots of blood throughout the car matching Edmondson's blood type, fresh black paint in areas, a .22 caliber spent shell casing, and strands of hair with paint globules which were similar to and could have come from the defendant. The .22 caliber shell casing had been fired from an old western–type revolver in poor condition. A former live–in

boyfriend of Rose had seen such a gun in Rose's Long Lake residence.

Glass particles matched the glass residue found at the Long Lake residence. In the firebox of the woodstove were found several buttons, identified by the victim's mother as buttons from his favorite leather jacket, more glass, and burned door hinges. On the morning of December 22, a neighbor observed Rose cleaning out the Gremlin, with the defendant standing nearby. The neighbor also observed thick, black smoke uncharacteristic of a wood fire, coming from the Long Lake residence. The neighbor further noticed the broken out kitchen door and that the defendant's hands were cut and scraped. The wheelbase of the Gremlin was identical to, and the width of the Gremlin's tires were within one–quarter inch of, the tire tracks where the body was found. Edmondson had withdrawn approximately $500 from the bank on December 15. Although fresh out of prison and unemployed, the defendant had five $100 bills hidden in his wallet when arrested.

While incarcerated in the Kitsap County Jail, awaiting trial, the defendant related the details of the murder to two of his cellmates, Jesse Noble and Fred Stocker. Virtually every detail disclosed was corroborated by the physical evidence. Noble testified regarding the contents of the defendant's incriminating statements in exchange for a favorable plea arrangement with the Kitsap County Prosecutor's Office. Stocker also testified as to the incriminating statements, but this testimony was given without any agreement for favorable treatment from the prosecuting attorney.

Because Rose stood to collect more than $200,000 in insurance proceeds upon the death of her husband, Edmondson, both the State and the defendant agreed that she had a motive to kill Edmondson. However, because of the events and the acts committed in concert by Rose and the defendant leading up to the victim's death, the State contended that Rose and the defendant planned together the murder. After a 17–day trial, the jury returned a guilty

verdict to first degree aggravated murder, concluding that two of the three alleged aggravating circumstances existed. The defendant was sentenced to life imprisonment without possibility of parole.

We first address defendant's contention of prosecutorial misconduct during trial. To prevail on a claim of prosecutorial misconduct, the burden is on the defendant to show that the prosecutor did not act in good faith and that the conduct complained of was both improper and so prejudicial as to deny the defendant a fair trial. *State v. Weekly,* 41 Wn.2d 727, 252 P.2d 246 (1952); *State v. Wilson,* 29 Wn. App. 895 (1981). The granting of a new trial on the basis of prosecutorial misconduct is a matter of the trial court's discretion, and a new trial should be granted only when there is substantial likelihood that such misconduct, considered in terms of its cumulative effect, may have affected the jury's verdict. *State v. Torres,* 16 Wn. App. 254, 554 P.2d 1069 (1976). Here, prosecutorial misconduct is contended to have occurred by (1) showing a photograph of the victim at the scene where his body was found to the victim's mother in order to have her identify her son, and then not immediately attempting to introduce the photograph into evidence; (2) continuous attempts to circumvent objections sustained by the court; and (3) deliberately using false or misrepresented evidence. We disagree.

Photographs are admissible even though they may be gruesome or unpleasant if their probative value outweighs their probable prejudicial effect, and the court's decision as to their admission will be reviewed only for an abuse of discretion. *State v. Jones,* 95 Wn.2d 616, 628 P.2d 472 (1981). Here, the court denied the defendant's motion in limine to prevent the showing of the photograph to the victim's mother. Further, the prosecutor refused to accept an offer by the defense to stipulate to the identity of the victim, and the court ruled that the prosecutor need not make such a stipulation. After the photograph was shown to the mother, the prosecutor did not at that time offer the photograph for admission into evidence. While the court

expressed concern over this tactic, the court accepted the prosecutor's explanation that he had intended to introduce the photograph through another witness first, but circumstances forced him to call his witnesses out of order. The court found that the jury was not prejudiced by the showing of the photograph and then admitted the photograph into evidence. Bad faith and prejudice on the part of the prosecutor are not demonstrated by the showing of the photograph, even though raising an emotional response. The trial court is not required to insulate jurors from all emotional responses from the victim's family.

Nor does the record support the defendant's charge of misconduct by the prosecution by circumventing a sustained objection made by the defense. The record discloses only that the prosecutor continued inquiry into the area objected to in order to establish the qualifications of a crime expert after the court sustained an objection as to foundation. The record further discloses that the court, in denying a motion for a mistrial based on this particular conduct by the prosecutor, did not regard the prosecutor's actions inappropriate or motivated by bad faith. We agree.

Finally, the record discloses that the prosecutor did not misrepresent or use false evidence. We disagree with defendant's contention that the prosecutor introduced the cable which barred access from the area where the victim's body was found for the purpose of showing that the Gremlin was scratched by the cable when defendant drove under it. Instead, the prosecutor acknowledged that there was no evidence of the Gremlin's paint on the cable and offered the cable in support of the theory that Rose held the cable above the car as the defendant drove the car beneath it, a theory supported by incriminating statements made by the defendant to one of his cellmates. Likewise, defendant contends that the victim's mother was unable to identify a button from her son's favorite leather jacket, when, in fact, she testified, "I am almost certain that it is, sir . . . it looks like the buttons that were on Bill's jacket." Other evidence claimed by defendant to be false or misrepresented does

not warrant detailed discussion. Close review of the record establishes that the court carefully limited the prosecution from entering evidence that was either cumulative or without proper foundation or probative value. The record further establishes that the prosecutor acted in good faith and drew reasonable inferences from the evidence, thus falling within the rule that counsel are permitted to draw and express reasonable inferences from the evidence produced at trial. *State v. Luoma*, 88 Wn.2d 28, 558 P.2d 756 (1977). Thus, we conclude there is no demonstration of bad faith or that the prosecutor acted improperly or so prejudicially as to deny the defendant a fair trial.

We now turn to the issue whether defendant's Sixth Amendment right to counsel was violated by the use of testimony by one of the defendant's cellmates, Jesse Noble. Although no objection was made as to the admissibility of Noble's testimony at trial, a manifest error affecting a constitutional right may be raised for the first time on appeal. RAP 2.5(a); *State v. Johnson*, 100 Wn.2d 607, 674 P.2d 145 (1983).

Incriminating statements given by a defendant to fellow cellmates are admissible where the cellmates are neither acting under government instruction nor as a government agent when incriminating statements are made. *United States v. Calder*, 641 F.2d 76 (2d Cir.), *cert. denied*, 451 U.S. 912, 68 L. Ed. 2d 302, 101 S. Ct. 1984 (1981). Recently, Division One of this court was faced with this issue and stated:

> [In *United States v. Henry*, 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183 (1980),] [t]he United States Supreme Court reversed the defendant's conviction, holding that "[b]y intentionally creating a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel, the Government violated [the defendant's] Sixth Amendment right to counsel." As the concurring opinion points out, "[t]o demonstrate an infringement of the Sixth Amendment, a defendant must show that the government engaged in conduct that, considering all of the circumstances, is the functional equiv-

alent of interrogation." . . .

. . . [T]he police in this case did not intentionally create a situation likely to induce the defendant to make incriminating statements, nor was there any deliberate and surreptitious interrogation of the defendant. Accordingly, the defendant was not denied his right to counsel as guaranteed by the sixth amendment to the United States Constitution.

(Citations omitted.) *State v. Brooks,* 38 Wn. App. 256, 261–62, 684 P.2d 1371 (1984).

Defendant contends that *Brooks'* stringent requirement of a "deliberate and surreptitious interrogation" is met in this case. He claims that at the time the statements were made to Noble, an agreement had been made by Noble with the State to exchange testimony of such statements for favorable treatment on Noble's pending charges. A review of the record does not support this position. Defendant's reliance on the testimony of Noble's attorney that such an agreement had been reached with the prosecutor on March 19, preceding the incriminating statements, is misplaced. The prosecutor asked the following of Noble's attorney.

When you reached some sort of a tentative agreement with the Prosecutor's Office, or at least told them of the information that Mr. Noble had learned, did Mr. Noble stay in the cell with Mr. Manthie during the ensuing week?

The attorney's affirmative response to this question does not establish that Noble was acting pursuant to an agreement when the incriminating statements were made. The defense made no effort to explore the nature of the purported tentative agreement nor did they explore the extent of Noble's knowledge of incriminating information, as related to his attorney, before or after the purported tentative agreement. In fact, defense counsel objected to the prosecutor's inquiry into both areas, which was sustained. We note that defendant's attorney stated at trial that there was no evidence of a deal being struck between the State and Noble on March 19. The defendant himself testified

that "you people never made a deal until the 26th, I believe it was." The record clearly discloses that Noble's attorney initiated the March 19 meeting, which led to the plea agreement entered on March 26.

We do not believe that the State is required to segregate every cellmate who informs the prosecutor that they "may have information" concerning a defendant. After the March 19 meeting, the State made no efforts to instruct Noble or elicit his cooperation in gathering information from the defendant. The State made no attempt to direct or control an interrogation of the defendant through Noble. It is not unusual for prisoners to claim to possess information concerning other prisoners, though it later turns out that such information is unreliable, unusable, or inaccurate. By claiming to have such information, a prisoner does not automatically obtain a "deal" or more favorable treatment. Finally, it is clear from a comparison of Noble's testimony with the statement made by Noble to the prosecutor on March 26 that no information of significance was learned by Noble after March 26, the date on which he effectively became the State's agent. Thus, we conclude that the State in this case

> did not intentionally create a situation likely to induce the defendant to make incriminating statements, nor was there any deliberate and surreptitious interrogation of the defendant. Accordingly, the defendant was not denied his right to counsel as guaranteed by the sixth amendment to the United States Constitution.

*State v. Brooks,* 38 Wn. App. at 262. There being no showing of a manifest error affecting a constitutional right, relief on this issue is not warranted.

Defendant next contends that the court erred in allowing Noble to testify, on the grounds that Noble was not credible and his testimony was only self–serving hearsay. We find no merit to this contention. Not only did defendant fail to raise this issue to the trial court, thus precluding review, RAP 2.5(a); *State v. Johnson,* 14 Wn. App. 225, 540 P.2d 435 (1975), but the admissibility of testimony is dis-

cretionary with the trial court, and no abuse of this discretion is demonstrated by the record nor argued in the briefs. An assignment of error not supported by argument is deemed abandoned. RAP 10.3(a)(5); *Lassila v. Wenatchee,* 89 Wn.2d 804, 576 P.2d 54 (1978).

■■ Defendant contends next that somehow the court erred by permitting the defense to allow into testimony evidence which might otherwise be inadmissible. Defendant argues that testimony by Rose presented by the defense and excerpts from Edmondson's diary admitted without objection by the defendant connect defendant with Rose and normally would be against his interest. However, the defense allowed the admission of this evidence as a trial tactic tending to divert the blame to Rose for the murder. We find no error here. As to Rose's testimony, the error, if any, is self–invited and is not subject to appellate review, even if a constitutional right is involved. *State v. Wilson,* 29 Wn. App. 895 (1981); *State v. Lewis,* 15 Wn. App. 172, 548 P.2d 587 (1976). The failure to object to the admission of the diary at trial precludes review on appeal. *Brown v. Safeway Stores, Inc.,* 94 Wn.2d 359, 617 P.2d 704 (1980).

Finally, we address defendant's contention that the court erred in its instructions regarding the alleged aggravating circumstances. In the court's instructions, the jury was given a special verdict form, in addition to the general verdict form. The jury was instructed to determine whether any of the following aggravating circumstances existed:

(1) The person committed the murder pursuant to an agreement that he would receive money or any other thing of value for committing the murder; or

(2) The person committed the murder to conceal the commission of a crime or to protect or conceal the identity of any person committing a crime; or

(3) The murder was committed in the course of, in furtherance of, or in immediate flight from a Robbery.

The jury determined the existence of aggravating circumstances (1) and (2) as set forth above. *See* RCW 10.95.020. They found that aggravating circumstance (3) set forth

above did not exist. Defendant contends (a) there was insufficient evidence to support the giving of any of the aggravating circumstances, and (b) that the second aggravating circumstance is in error as the only crime which the defendant could have concealed by the murder is an assault of the victim just prior to his murder, which assault was incidental to and "merges" with the first degree murder, and therefore should not have been considered as an aggravating circumstance.[1] We disagree with both these contentions.

There is sufficient evidence in the record to support the trial court's giving of each of the alleged aggravating circumstances. First, as to whether the defendant committed

---

[1]By pro se reply brief, defendant additionally contends the court erred in its instructions regarding the aggravating circumstances because (1) the jury was not specifically instructed that it must be unanimous on each aggravating circumstance that it found to exist, and (2) the court did not instruct as to each of the elements of each aggravating circumstance. The court did instruct as to the elements of robbery, but not of assault or of the purported agreement under which the defendant was to have committed the murder. These additional contentions are based upon *State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980), which held that under former RCW 9A.32.045(7), which defined aggravated first degree murder as first degree murder committed in the course of rape or kidnapping, the jury must be unanimous as to the commission of one or both of the underlying offenses. The court stated that where statutory offenses can alternatively provide an element of a more serious crime, the jury must be unanimous as to the underlying crime in order to convict on the more serious crime. *State v. Green*, 94 Wn.2d at 233; *see also State v. Socolof*, 28 Wn. App. 407, 409, 623 P.2d 733 (1981). *Green* further held that the jury must be instructed to find each element of the underlying crime. *State v. Green*, 94 Wn.2d at 233. We decline to decide either contention raised by defendant. No objection was raised to the trial court on these grounds, nor were instructions offered. It is improper to raise issues, even of constitutional magnitude, for the first time by reply brief, as there is no opportunity for an opposing party to respond, and such issues need not be considered by the appellate court. RAP 10.3(c); *Mead Sch. Dist. 354 v. Mead Educ. Ass'n*, 85 Wn.2d 278, 534 P.2d 561 (1975). We note, however, that even if the special verdict forms do not definitely establish that the jury was unanimous in its finding of the existence of both the first and second aggravating circumstances, so long as there is substantial evidence on the alternative aggravating circumstances, *Green* suggests there may be no error under *State v. Arndt*, 87 Wn.2d 374, 553 P.2d 1328 (1976). *See State v. Green*, 94 Wn.2d at 232.

the murder pursuant to an agreement, the first aggravating circumstance, the testimony of Noble established that the defendant and Rose had planned for the defendant to murder the victim after he got out of the Montana State Prison, and that Rose and the defendant planned on receiving money from the victim's life insurance. This testimony in conjunction with many of the acts established in the record committed in concert by Rose and the defendant leading up to the victim's death is sufficient to warrant this issue going to the jury.

With respect to the second aggravating circumstance, Noble's testimony also establishes that the defendant assaulted the victim inside the Long Lake residence by striking or kicking him in the nose, that the victim indicated he would inform the defendant's parole officer of the assault, and that the defendant then decided to shoot and kill the victim inside the moving car, which was at a subsequent time and some distance away from the initial assault. Moreover, Noble's testimony was consistent with the physical evidence of the victim's facial injuries, as well as the physical evidence of a violent episode at the house and the shooting in the car. This evidence, if believed, sufficiently supports the separate and distinct nature of the two crimes, committed at points distinct in time and location, so as to warrant this issue also going to the jury. *See State v. Stirgus,* 21 Wn. App. 627, 586 P.2d 532 (1978). We note in this regard that this court only decides the sufficiency of the evidence. The credibility of the witnesses is for the jury to decide.

Finally, because the jury found that the third aggravating circumstance, robbery, did not exist, we do not see how the defendant was prejudiced by the court's giving of this particular aggravating circumstance. In any event, there was sufficient evidence to support the court's instructing on this particular aggravating circumstance as well.

The judgment is affirmed.

REED, A.C.J., and PETRIE, J. Pro Tem., concur.

Review denied by Supreme Court June 7, 1985.