[Nos. 7347–5–III; 7359–9–III; Division Three.     July 28, 1987.]
7416–1–III; 7417–0–III.

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT
DEAN BROWN, ET AL, *Appellants*.

*Thomas A. Bothwell*, for appellants (appointed counsel for appeal).

*Jeffrey C. Sullivan, Prosecuting Attorney*, and *Robert N. Hackett, Deputy*, for respondent.

McINTURFF, C.J.—Robert and Raymond Brown appeal their jury convictions of first degree rape.[1] We reverse

---

[1]The Browns also filed additional appeals; Robert from the revocation of his probation following his first degree rape conviction and Raymond from the revocation of his parole. Their respective probation and parole had been imposed

because the Superior Court erred in excluding (1) evidence that the rape prosecutrix had used LSD the evening in question and (2) expert testimony that LSD may affect the perceptual abilities of users.

On Sunday evening, April 28, 1985, an 18–year–old woman attended a party at a house in Yakima. After she left the party about 1:30 a.m., she accepted a ride from the two defendants and David Roberts, who also had attended the party. She testified that the defendants took her to a house and raped her. The defendants and Mr. Roberts stated that she consented to sexual contact with all three of them.

Testimony concerning the young woman's behavior at the party varied. She stated that she consumed three to four large glasses of beer, took four drags off a marijuana joint, and conversed with several friends. She specifically denied hugging or kissing anyone at the party. To the contrary, the defendants, Mr. Roberts, and several other men who were there testified she behaved loosely, *i.e.*, she approached many different men, hugged and kissed them, rubbed their crotch area, and, on one occasion, followed the party's host to the backyard and offered to hold him while he urinated. They described her as very drunk.

The prosecutrix testified she decided to jog home about 1 or 1:30 a.m. and had just started on her way when a black Camaro approached her from behind. The defendant Robert Brown was at the wheel and asked her if she wanted a ride home. At first, she declined. She did not immediately recognize the defendant as someone from the party. He continued to drive alongside her for a few minutes, and she decided to accept the offer. She stated she climbed into the backseat next to David Roberts, whom she knew from school. There was another man in the front passenger seat, but she testified she did not get a good look at his face.

Once she was inside the car, Robert Brown drove in the

following their commission of earlier nonviolent crimes. Since the issues are the same, these appeals have all been consolidated for review.

opposite direction from her home. When she questioned him about it, he told her they were going to make a quick stop at a friend's house and then would take her home. When they arrived at the friend's house, she was going to remain in the car, but they urged her to come in, "just for a minute," and she agreed. She followed the three men into the dark house. Then, she was attacked by Robert Brown in the living room. He tried to remove her pants, and she started screaming. He forced her into an adjoining bedroom, threw her on the bed, held her hands over her head, but was unable to accomplish intercourse because he could not pry her legs apart. At this point, the defendant Raymond Brown entered the bedroom and forcibly held her legs while his brother had intercourse with her.

Afterward, she pulled on her pants and ran. Several blocks away, she knocked on the door of a house and asked to use the phone. Andy Cattenburg, the owner, testified she was crying uncontrollably, and he had to take the phone to tell the family member she had called that the young woman had apparently been assaulted and was at his address. Her relative picked her up and took her to a hospital.

The doctor and nurse who attended the prosecutrix also testified that she was emotionally distraught. They collected samples from her for lab work. After Robert and Raymond Brown were arrested and charged with first degree rape, the court ordered them to provide blood samples to the prosecutor's office. At trial, an expert for the State testified that the young woman and both of the Browns had type A blood. According to the State's expert, semen samples from the prosecutrix's vagina and her panties were from a male with type A blood.

The Brown brothers and David Roberts testified to events radically different from those described by the young woman. They stated she told them she did not want to go home, and that she readily agreed when Mr. Roberts suggested they go to his house to watch movies. Once there, she and Robert sat on the living room couch and hugged

and kissed, and then moved into the bedroom. Robert said he was unable to gain an erection, and she told him to send in someone who could perform. At that point, Raymond was in the hallway after leaving the bathroom. Robert gestured Raymond into the room and left. Raymond stated he had oral sex with her and she then told him to get David Roberts. Mr. Roberts testified that he had sexual intercourse with her and ejaculated inside her.

All three men stated that the young woman became very upset immediately after she and Mr. Roberts finished intercourse. She cursed them, pulled on her clothes, and ran out the door, yelling that she would "get" them. The Browns attempted to follow her to offer her a ride home, but could not find her.

At trial, the Browns also produced an expert. He identified a blood sample produced by Mr. Roberts as type O. He also conducted his own tests on the samples from the prosecutrix and concluded that the type A secretions in those samples might well have come from her and also that her secretions might have been in sufficient quantity to mask any type O secretions present in the semen.

In their case, defendants made an offer of proof that Wayne Stewart would testify the prosecutrix told him on the evening in question that she was "flying high on CID", another name for LSD. They also made an offer of proof that Dr. Neal McCarthy, a psychiatrist with knowledge of the symptoms of LSD, would testify that the drug can cause perceptual distortions and mood swings.[2] The court refused to admit the testimony of either witness on the

---

[2]Dr. McCarthy stated:

"Q. Can [LSD] cause any kind of shift or sudden change in mood?

"A. Yes, it can.

"Q. . . . Does [LSD] affect an ability to perceive or to remember accurately?

"A. . . . It affects all of the perceptual senses such as feeling, movement, taste, seeing, hearing, any of the perceptual olfactory, and some if it is blown out of proportion. It will make them very hypersensitive or it can make them so they can't perceive reality as it is.

"Q. Okay. Now, in its milder forms, does it always produce or necessarily produce psychotic state?

grounds that (1) the prejudicial effect of the testimony outweighed its probative value, and (2) the expert's opinion was not based on a reasonable medical certainty.[3]

■ The general rule is stated in 2 C. Torcia, *Wharton on Criminal Evidence* § 459, at 398 (13th ed. 1972):

> Evidence of a witness' use of opium, morphine, or a similar drug is not admissible for the purpose of impeaching his credibility, *unless the witness was under the influence of such a drug* while testifying or *when the event to which he testified occurred* . . .

(Italics ours.)

Interestingly, there are numerous, older Washington cases which address the issue. In *State v. Smith,* 103 Wash. 267, 174 P. 9 (1918), the court held that in a prosecution for selling morphine without a physician's prescription, where the prosecuting witness was under the influence of morphine at the time of the sale and of her accusation, the defense was entitled to prove by expert testimony the effect

---

"A. No, it does not in all cases. They don't know exactly why in some people it produces psychotic state and other people why it doesn't.

"Q. Does it always in its milder forms produce gross hallucinations?

"A. Perceptual distortions would be better than hallucinations.

". . .

"Q. Can it produce what might be otherwise described as a hysteric state emotionally?

"A. Emotionally labile state, yes."

[3]The court also refused to admit the testimony of Dr. McCarthy because the defense did not give the prosecution timely notice of its intent to call him as a witness. Under CrR 4.7(b), the defendant is obliged to disclose the names and addresses of its witnesses to the prosecution no later than the omnibus hearing. CrR 4.7(h)(2) imposes a continuing duty to disclose information, such as witnesses' names, which subsequently come into the possession of the party. Failure to comply with CrR 4.7 may result in an order compelling discovery, a continuance, or dismissal of the action. CrR 4.7(h)(7)(i). In instances where the *State* has failed to disclose testimony, our court has held that exclusion of the testimony is improper under CrR 4.7(h)(7)(i). *State v. Terrovona,* 105 Wn.2d 632, 652, 716 P.2d 295 (1986); *State v. Laureano,* 101 Wn.2d 745, 762, 682 P.2d 889 (1984). There is no reason why exclusion should be allowed as a sanction for the failure of the defense to comply with CrR 4.7 when it is not allowed as a sanction against the State. The proper response here would have been to allow the State a continuance, if needed to prepare to meet Dr. McCarthy's testimony.

of the drug upon her mind and memory. In *State v. Schuman,* 89 Wash. 9, 153 P. 1084 (1915), several prostitutes, testifying for the State in the trial of a police officer charged with accepting the earnings of prostitutes, denied that they had used drugs. The defendant unsuccessfully attempted to introduce medical testimony that cocaine users lose the power to distinguish truth from falsehood. The court at pages 19–20 recognized the general rule stated in *Wharton* but held that the testimony of one police officer that he had heard one of the witnesses used cocaine was not evidence tending to establish habitual use. And, in *State v. Robinson,* 12 Wash. 491, 497, 41 P. 884 (1895), the court upheld the exclusion of medical testimony of the effect of morphine on a witness who admitted its use. The court stated that the testimony would have been admissible if it had gone to the effect upon the witness' mental faculties, but since it instead concerned the drug's effect on his veracity, it was properly excluded. *Robinson. See also* Annot., *Use of Drugs as Affecting Competency of Credibility of Witness,* 65 A.L.R.3d 705 (1975).

*People v. Ortiz,* 40 A.D.2d 857, 338 N.Y.S.2d 8 (1972) is on point. There, the defendant was charged with the murder of a salesman during a robbery. A witness testified that prior to the crime the defendant had importuned him to rob the salesman, but he declined. Like the prosecutrix here, the witness in *Ortiz* denied during cross examination that he used narcotics. The trial court refused to admit testimony that the witness had told a defense witness that at the time he had the incriminating conversation with the defendant he was "sick" from taking a shot of heroin. The trial court said it was a collateral matter so the defense was bound by the State witness' denial. The appellate court reversed, citing *People v. Webster,* 139 N.Y. 73, 34 N.E. 730 (1893), and stating:

> While it is true that a cross–examiner is normally bound by a witness' responses concerning collateral matters and may not introduce contradictory evidence, this is only true where the evidence is offered *solely* to impeach the

witness' credibility. Here the evidence was offered on the issue of the witness' ability to perceive, retain and transmit certain events. On that issue the testimony was proper. This was particularly so since the issue of the witness' ability to perceive, etc., was not only not collateral, but critical to both parties' case.

(Citation omitted.) *Ortiz*, at 857–58. Similarly, the Pennsylvania court has held it was error for the trial court to refuse the opinion testimony of the lay witnesses that they had observed the rape prosecutrix drinking and believed her to be intoxicated at a point close in time to the alleged rape. *In re Wright*, 265 Pa. Super. 278, 401 A.2d 1209 (1979).

■ Here, the Superior Court engaged in a balancing process under ER 403 and determined the evidence was inadmissible because its prejudicial effect to the truth finding process outweighed its probative value. "The trial court has broad discretion in administering the rule, and its judgment in the balancing process will be rarely disturbed." 5 K. Tegland, Wash. Prac., *Evidence* § 105, at 246 (2d ed. 1982). However, ER 403 does not extend to the exclusion of crucial evidence relative to the central contention of a valid defense. K. Tegland, at 246 n.3 (citing *United States v. Wasman*, 641 F.2d 326 (5th Cir. 1981)).

We hold that the evidence of the young woman's ingestion of LSD and its effect is crucial evidence. With such evidence, the defendants could have argued that the prosecutrix believed she was resisting sexual contact when, in fact, she was not and that her hysterical state at the hospital was drug induced and not the result of rape. Thus, the trial court abused its discretion in excluding it.[4]

■ The State argues that Dr. McCarthy's testimony was inadmissible because it was not stated in terms of a rea-

---

[4]In the cases cited by the State, the courts were not confronted with the situation here, *i.e.*, where the witness allegedly is under the influence of drugs at the time of the events to which he testified and such influence may have affected his perception. *State v. LeFever*, 102 Wn.2d 777, 690 P.2d 574 (1984); *State v. Renneberg*, 83 Wn.2d 735, 738, 522 P.2d 835 (1974); *State v. Carr*, 13 Wn. App. 704, 707–08, 537 P.2d 844 (1975).

sonable medical certainty, and he had neither personally examined the prosecutrix nor reviewed medical records of such an examination so as to form an opinion as to whether she was under the influence of LSD that night. *State v. Edmon,* 28 Wn. App. 98, 102, 621 P.2d 1310, *review denied,* 95 Wn.2d 1019 (1981). The State misapprehends the purpose of the defense in offering Dr. McCarthy's testimony. He was not called to testify to the prosecutrix's condition. Rather, his testimony was general, *i.e.,* if the evidence led the jury to believe the prosecutrix had taken the drug, then it could use Dr. McCarthy's testimony to evaluate the drug's effect on her perceptions. *Edmon* is not applicable to this situation.

Since the foregoing error cannot be characterized as harmless, we reverse the Browns' convictions.

Pursuant to RCW 2.06.040, the remaining contentions and the court's answers to those contentions, having no precedential value, will not be published.

GREEN and MUNSON, JJ., concur.