[No. 8319–5–III.   Division Three.   July 7, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. NOYES RUSSELL HOWARD, *Appellant.*

*Susan Hahn, Schwab, Kurtz & Hurley,* and *Timothy Ford,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Gregory Canova, Assistant,* for respondent.

GREEN, J.—Noyes Russell Howard was convicted of the first degree murder of his wife, Donna Howard. He appeals contending the court should have dismissed the charge because (1) the State failed to preserve potentially exculpatory evidence in violation of his due process right to a fair trial; and (2) the delay between the victim's death and the trial was prejudicial. He further contends the court erred by (3) admitting testimony from his second wife, Pepper Howard, in violation of the marital privilege; (4) refusing to grant a mistrial based upon prosecutorial misconduct; and (5) excluding evidence of prior dangerous behavior of a horse owned by Donna Howard. We affirm.

On the morning of January 10, 1975, Mr. Howard found Donna lying on the ground in the loafing shed attached to a

horse corral behind their home near Yakima. She had suffered severe head injuries. Medics were summoned; they confirmed Donna was dead. Sheriff's detectives arrived and investigated the scene, taking several black and white photographs of the body and surrounding area. Measurements were taken, but evidence from the scene was not tested or gathered by the detectives.

An autopsy performed the following day by Yakima County Coroner Dr. Richard Muzzall revealed two separate injuries to the skull—a massive fracture to the lower left portion and a small ovoid fracture above the right temple. Photographs were not taken of the autopsy and tissue samples from around the wounds were not preserved. On January 11 Dr. Muzzall and Detective Robert Langdale examined the scene and concluded Donna Howard was killed when a horse kicked her in the back of the head as she knelt near a railroad tie. They believed the kick forced her into the railroad tie with a sharp protrusion causing the smaller ovoid fracture. On January 13 Mr. Howard was interviewed by sheriff's detectives and gave an alibi statement. The death was ruled accidental and the case was closed on that date.

During April Detective Langdale reopened the investigation at the request of Bobbi Bennett, the victim's sister. Over the next several months, he conducted interviews and revisited the scene of Donna's death. No inference of foul play was discovered; the case was again closed in December.

In September 1976, after further requests from Ms. Bennett, Yakima County Prosecutor Jeff Sullivan requested Dr. William Brady, the Oregon State Medical Examiner, to conduct an exhumation autopsy to determine whether possible prosecution was warranted. Dr. Brady concluded Donna's death could have been caused as Dr. Muzzall theorized. At that time, the Bennett family retained a private expert, Dr. Robert Bucklin, who attended the autopsy and took the victim's skull to Los Angeles for reconstruction and preservation. When he was unable to state with medical certainty that Dr. Muzzall's conclusions were wrong, it

was again concluded Donna's death was accidental. No further official investigation was conducted until June 1980.

Meanwhile, in June 1975 Mr. Howard married Karen Howard, nicknamed "Pepper", with whom he had been having an affair prior to Donna's death. In 1978 they were divorced and Pepper left the area. She returned on two or three occasions and, on at least one of those occasions, she lived with Mr. Howard. During June 1980, Mr. Howard and Pepper were disputing over who owned certain furniture; a sheriff's deputy, who was a personal friend of Pepper, accompanied her to Mr. Howard's home—she demanded the furniture and Mr. Howard refused. After the deputy told her he wished he could do something to help her because Mr. Howard had no respect for the law, Pepper then stated to the deputy "off the record" that in 1975 Mr. Howard told her he had killed Donna with a claw hammer. A few days later she gave a similar statement to Detective Jerry Hafsos and the investigation was reopened. In October 1980 Deputy Prosecutor Robert Hackett interviewed Pepper, but no record of the interview was made. He reviewed the prior investigative reports, and on January 8, 1981, concluded in a memorandum to Mr. Sullivan that charges should not be filed, in part because, Mr. Howard's "detailed 'confession' was made, according to [Pepper] while they were married."

Later in 1981, at the request of the Bennett family, the Governor's Office requested the Attorney General to intervene. After a 2½-year investigation, the State in November 1984 formally charged Mr. Howard with first degree murder. The Attorney General prosecuted the case due to the likelihood a Yakima deputy prosecutor would be called to testify. On December 17, 1984, Mr. Howard sought an order requiring the State to pay the attorney fees and costs of his defense. The order was granted and the State appealed (*State v. Howard*, 106 Wn.2d 39, 722 P.2d 783 (1985)). After a delay of almost 2 years, trial commenced on October 21, 1986—nearly 12 years after Donna Howard's death. On October 31 the jury returned a verdict of guilty and Mr.

Howard was sentenced to life imprisonment with a 20–year minimum.

First, Mr. Howard contends his due process rights were violated because the State failed to preserve potentially exculpatory evidence, citing *State v. Wright*, 87 Wn.2d 783, 557 P.2d 1 (1976) and *State v. Pennewell*, 23 Wn. App. 777, 598 P.2d 748, *review denied*, 92 Wn.2d 1036 (1979). Additionally, citing *State v. Vaster*, 99 Wn.2d 44, 659 P.2d 528 (1983), he argues there is a reasonable possibility the missing evidence affected his ability to present a defense; instead the court assumed the lost evidence would prove guilt, thereby stripping away his presumption of innocence when to the contrary the evidence would have raised a reasonable doubt which did not otherwise exist as to guilt. *State v. Canaday*, 90 Wn.2d 808, 815, 585 P.2d 1185 (1978).

On the other hand, the State argues the court correctly determined there was no affirmative duty to preserve particular evidence, as investigators concluded no crime was committed. Moreover, the State does not have a duty to search for and preserve all potentially exculpatory evidence. *State v. Jones*, 26 Wn. App. 551, 614 P.2d 190, *review denied*, 94 Wn.2d 1008 (1980); *State v. Hall*, 22 Wn. App. 862, 593 P.2d 554, *review denied*, 92 Wn.2d 1021 (1979). We agree.

The State is required to preserve all potentially material and exculpatory evidence under its control in order to afford due process protections to the accused. *State v. Wright, supra* at 788–90. This duty is based on the obligation to disclose exculpatory evidence to insure a fair trial for the accused. *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963); *Wright*, at 791. The duty also applies to agents (including private citizens) acting under prosecutorial authority, *State v. Vaster, supra* at 53; *Wright*, at 793. Good faith or inadvertent failure to preserve evidence does not abridge the right to a fair trial unless there exists a reasonable possibility it was material and favorable to the defense; "reasonableness" is determined in light of the circumstances of each case, *Vaster*, at

52, including all the other evidence which could be presented. *Seattle v. Duncan,* 44 Wn. App. 735, 740, 723 P.2d 1156 (1986); *State v. Huxoll,* 38 Wn. App. 360, 366, 685 P.2d 628, *review denied,* 102 Wn.2d 1021 (1984).

■ While much of the evidence was immediately available to investigators, Donna Howard's death was ruled accidental and the case was closed on January 13, 1975, 3 days after her death.[1] Thus, any duty to preserve potentially exculpatory evidence was extinguished at that time. When the investigation was reopened in April 1975, the State had the duty to preserve *available* evidence. However, the duty was again extinguished in December 1975 when no inference of foul play was uncovered and the case was again closed. Assuming an investigation was in progress during the September 1976 exhumation autopsy, it again

---

[1]Mr. Howard argues the failure to test or preserve the following items of evidence was a violation of due process: (1) the railroad tie upon which it is contended Donna hit her head; (2) a blanket that covered her body was never examined for bloodstains to determine whether it was used to conceal a murder or to merely cover the body as claimed by the defense; (3) Donna's clothing which may have revealed traces of dirt or snow to correspond with the defense theory she was working in the shed at the time of the incident; (4) tissues from Donna's wounds were not preserved and the original autopsy was insufficient to later describe the cause; (5) tissues around a contusion on her hand were never sampled, thus allowing a prosecution expert to state it could have been incurred in defense to a hammer blow; (6) defense experts never had a chance to examine the bone fragment corresponding to the right side skull fracture, which could have shown it was the wrong shape to have been caused by a hammer blow (This fragment was lost by Dr. Bucklin. There is no showing that the loss occurred during an official criminal investigation.); (7) alleged blood stains on the wall of the shed were not tested until 1984 when no trace of blood was found—a similar test conducted years earlier would have undercut the prosecution's theory; (8) a witness at the scene allegedly stated one of the horses was a "mean sonofabitch", but the statement was inadmissible because no record was made of who said it; (9) the victim's father died before trial and could have told the jury of his advice to get rid of the horse 2 weeks before her death; (10) police measurements of the scene and the records of ambulance attendants would have confirmed recollections of witnesses and corroborated Mr. Howard's alibi (the ambulance records were destroyed by the company in the usual course of business by 1982); (11) a record of Pepper Howard's statement in 1980 to Deputy Prosecutor Hackett that Mr. Howard's "confession" occurred during marriage would have shed doubt on her credibility at trial. Mr. Howard's argument must be rejected as there is no showing of bad faith in the failure to preserve this evidence.

was determined no criminal act was involved. Further investigation did not occur until 1980. During the interim, there was no duty to preserve any evidence.

In *State v. Hall, supra,* defendant argued the State failed to preserve samples of a charred bridge which might have supported his claim he accidentally caused a fire. The State conceded that arson was initially suspected. The court declined to expand *Wright* to require investigators to search for exculpatory evidence or exhaustively pursue every angle:

The police are required only to preserve that which comes into their possession either as a tangible object or a sense impression, if it is reasonably apparent the object or sense impression potentially constitute material evidence.

*Hall,* at 867. Similarly, in *State v. Jones, supra,* the court declined to expand the *Wright* doctrine when defendant argued his due process rights were violated because the State did not investigate an additional alleged suspect and failed to identify other fingerprints from the crime scene. We likewise decline to expand the *Wright* decision to the facts presented in the instant case.[2]

Second, Mr. Howard contends the lapse of nearly 12 years between Donna's death and his trial was presumptively a prejudicial delay which justifies dismissal of the charges. *State v. Haga,* 8 Wn. App. 481, 507 P.2d 159, *review denied,* 82 Wn.2d 1006 (1973) (*Haga* I). He also argues the 2–year pretrial delay caused by the State's interlocutory appeal over whether the County or State should pay for his defense compounded a speedy trial violation. *United States v. Herman,* 576 F.2d 1139 (5th Cir.

---

[2]*State v. Pennewell, supra,* also supports the State's position. There, a defendant who intentionally misled emergency room physicians and the coroner about the manner in which his infant son sustained injuries was not permitted to take advantage of his actions and claim the *Wright* doctrine applied to destroyed clothing. Similarly, Mr. Howard's alibi statements to investigators led them to believe no crime was committed. *Pennewell* does not state, as contended by Mr. Howard, that the duty to preserve applies even if evidence is destroyed when no crime is suspected.

1978). On the other hand, the State argues Mr. Howard has not specifically demonstrated actual prejudice, which is required for reversal. *State v. Haga,* 13 Wn. App. 630, 536 P.2d 648, *review denied,* 86 Wn.2d 1007 (1975), *cert. denied,* 425 U.S. 955 (1976) *(Haga* II). The interlocutory appeal did not present a speedy trial violation. *Barker v. Wingo,* 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972). We agree with the State's position.

■ Precharging delay is tested under the due process clause. *United States v. MacDonald,* 456 U.S. 1, 71 L. Ed. 2d 696, 102 S. Ct. 1497 (1982); *State v. Ansell,* 36 Wn. App. 492, 497, 675 P.2d 614, *review denied,* 101 Wn.2d 1006 (1984). To justify reversal, the accused must specifically demonstrate actual prejudice to his defense from the delay. *Haga* I, at 489. The prejudice shown must be sufficient to overcome the legislative intent to prosecute the crime as there is no statute of limitation with respect to the crime of murder. RCW 9A.04.080. Whether there is actual prejudice depends on the circumstances of each case and is best assessed by the trial judge who has the unique opportunity to judge the credibility of witnesses and sense the atmosphere of the trial. *Haga* II, at 633–34. The court in *Haga* I, at 486, referred to Justice Brennan's concurring opinion in *Dickey v. Florida,* 398 U.S. 30, 26 L. Ed. 2d 26, 90 S. Ct. 1564 (1970), which suggested that once precharging delay reached a certain point, substantial prejudice should be presumed; it was not specified when such a presumption arises. Moreover, precharging delay is justified where there is insufficient evidence to prosecute until the charges are filed. *Haga* I, at 487.

In claiming the precharging delay is presumptively prejudicial, Mr. Howard equates the *Haga* standard with the claimed due process violations arising from the failure of the State to preserve the evidence. He argues if the burden to demonstrate actual prejudice applies, there is little difference between the due process issues arising out of the lost evidence and the charging delay. This argument must fail. Even if the State violated a duty to preserve evidence,

Mr. Howard has not shown a "reasonable possibility" that its loss affected his ability to present a defense. *State v. Vaster, supra.*[3] He offers nothing other than the general loss of evidence to demonstrate the required *actual prejudice* occasioned by precharging delay.

*Commonwealth v. Ware,* 459 Pa. 334, 329 A.2d 258 (1974), upon which Mr. Howard relies, is factually distinguishable. There the court found a 117–month delay between *arrest* and commencement of trial was presumptively prejudicial to defendant's *speedy trial right,* yet found defendant suffered no prejudice. At issue here is a 118–month *precharging* delay. In light of the absence of a statute of limitation, Mr. Howard has not shown he was prejudiced by this delay. The State charged Mr. Howard as soon as it determined there was sufficient evidence to do so. *Haga* I, at 487.

▮ Mr. Howard's argument the 2–year delay caused by the State's interlocutory appeal compounded the speedy trial violation must also fail. This argument shifts the analysis to the postaccusation speedy trial issue. In *Barker v. Wingo, supra,* the Court created a balancing test to determine when an accused's constitutional rights to a speedy trial have been violated. The factors to consider are: (1) length of delay; (2) reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker,* 407 U.S. at 530. *See State v. Newcomer,* 48 Wn. App. 83, 88, 737 P.2d 1285, *review denied,* 109 Wn.2d 1014 (1987).

▮ Immediately before the trial, the defense argued the interlocutory appeal by the State which determined whether the State or County was responsible for defense costs was collateral to the charge against Mr. Howard. His

---

[3]There is no way to ascertain the materiality of the unpreserved evidence. However, at trial both sides utilized experts and examined witnesses to recreate the events based upon their theories. This was in contrast to the only direct evidence presented to the jury, Pepper Howard's testimony detailing Mr. Howard's "confession" to her that he killed Donna by striking her three times with a claw hammer.

motion to dismiss on this basis was denied. Applying *Barker,* the trial court noted Mr. Howard was the original moving party on the defense cost issue and the reason for delay was the appellate process itself. In addition, the court noted mere passage of time could be prejudicial in some cases, but none was shown here as the evidence was the same before and after the appeal. Mr. Howard points to no other instances of prejudice. His reliance on *United States v. Herman, supra,* is misplaced. There the court analyzed the "reason for delay" factor in *Barker* more closely because the defendant, unlike Mr. Howard, was incarcerated during an interlocutory appeal. Notwithstanding, the court found the delay, while somewhat prejudicial, did not require dismissal. None is shown here; hence, there was no error in denying the motion to dismiss.

Third, Mr. Howard contends the court improperly denied his pretrial motion to suppress certain testimony of Pepper Howard on the basis of marital privilege. RCW 5.60.060(1). He argues Pepper was allowed to testify without any independent determination by the court as to whether the privilege applied. As a result, the jury heard testimony devastating to his defense. To the contrary, the State argues a proper ruling was made and the testimony was admissible. We agree with the State's position.

RCW 5.60.060(1) prevents a spouse from being examined as to confidential communications made by one to the other during marriage. *State v. Thorne,* 43 Wn.2d 47, 55, 260 P.2d 331 (1953); *State v. Bonaparte,* 34 Wn. App. 285, 288, 660 P.2d 334, *review denied,* 100 Wn.2d 1002 (1983). The purpose of this privilege is to encourage mutual understanding and trust. *Bonaparte,* at 288. ER 104(a) requires the trial court to determine preliminary questions regarding the existence of a privilege. 5 K. Tegland, Wash. Prac. §18, at 56 (2d ed. 1982).

The issue here was whether an alleged confession by Mr. Howard to Pepper occurred before or after their June 1975 marriage. Statements given by Pepper on July 1, 1980, to Detective Hafsos and on April 6, 1982, to Robert Keppell of

the Attorney General's Office seemed to indicate the conversation took place after marriage. However, in a third interview conducted in early 1986 by defense counsel in the presence of Assistant Attorney General Canova, Pepper indicated the statements were made during the week prior to marriage. The court acknowledged the issue was a question of law and required an offer of proof before ruling on its admissibility.

During the offer of proof, Pepper testified that 3 or 4 days prior to Donna's death, Mr. Howard told her how he would kill Donna with a claw hammer and make it look like a horse kicked her. She also related how Mr. Howard came to her house the evening of the incident and told her if she said anything about the incident he would make sure she went down with him. Pepper then testified that the conversation which occurred at the Chalet Inn (wherein Mr. Howard described to her the murder and his alibi) was about a week before the marriage. She stated that after her previous accounts on the event, she realized that the conversations with Mr. Howard at the Chalet Inn took place before their marriage because it was on the day they were meeting with the minister to discuss the wedding. During this offer of proof, the defense attempted to cross–examine her regarding the 1980 and 1982 statements. The court sustained the State's objection, stating it was convinced Pepper now believed the statements at the Chalet Inn were made before marriage and ruled them admissible, with her credibility to be a matter for cross examination before the jury.

The testimony of Pepper Howard at trial was consistent with her pretrial statements. She described Mr. Howard's alibi and his statements to her in the Chalet Inn:

He said that he had to hit her three times.

. . .

With the hammer. And he thought it would only take once, but it took three times, and that when he came back and found her, that it looked like she hadn't died right away because she wasn't in the same spot as where

he had left her, and that it looked like she had tried to climb up the side of the barn.

This testimony is not inconsistent with the prosecution's theory that Donna was brought into the loafing shed after being struck by the hammer and leaned against the wall leaving swiped–shaped bloodstains and her body carefully positioned to indicate she had been kicked by a horse and forced into the railroad tie. The court properly handled the marital privilege issue and despite extensive cross examination of Pepper at trial, including asking her about previous contradictory statements, it is evident the jury found her to be credible. There was no error.

Fourth, Mr. Howard contends the court abused its discretion in refusing to grant a mistrial after the prosecutor referred to previously excluded evidence in his opening statement. He argues it was reversible error to rule the misconduct harmless prior to hearing the trial evidence. *State v. Reed,* 102 Wn.2d 140, 684 P.2d 699 (1984).

The State argues there was no abuse of discretion; and, posttrial the court properly determined there was no substantial likelihood that prosecutorial misconduct affected the jury verdict. *State v. Manthie,* 39 Wn. App. 815, 696 P.2d 33, *review denied,* 103 Wn.2d 1042 (1985). We agree.

To determine whether a prosecutor's improper comments deny the defendant a fair trial, there must be a substantial likelihood they affected the jury. *State v. Reed, supra* at 145. While the sixth amendment to the United States Constitution and Const. art. 1, § 22 (amend. 10) entitle a defendant to a trial by an impartial jury, the right does not include an error–free trial. *Reed,* at 145; *State v. Latham,* 100 Wn.2d 59, 66, 667 P.2d 56 (1983). The prejudicial nature of the misconduct depends upon the facts of each case, *State v. Torres,* 16 Wn. App. 254, 264, 554 P.2d 1069 (1976), and rulings on motions for a mistrial are within the trial court's discretion. *State v. Acheson,* 48 Wn. App. 630, 636, 740 P.2d 346 (1987), *review denied,* 110 Wn.2d 1004 (1988). The failure to request a curative instruction or to object to an allegedly improper remark

constitutes a waiver of the error unless the statement is so flagrant and ill intentioned that the resulting prejudice could not have been neutralized by admonition to the jury. *State v. Dunaway*, 109 Wn.2d 207, 221, 743 P.2d 1237 (1987).

During opening argument, the prosecutor related Pepper Howard's expected testimony to the jury and then stated: "Pepper won't tell you about conversations that occurred during the interim time when they were married. She can't do that." A motion for a mistrial was not made until after the defense's opening statement and the testimony of the State's first witness. Defense counsel stated in opening argument that the prosecutor's statements were not evidence, but never requested a curative instruction fearing it would reinforce the prosecutor's statement. The court did not consider the issue waived and ruled error, if any, was harmless and not of constitutional magnitude. It noted Pepper would likely testify that Mr. Howard told her post-marriage communications were privileged and she did.

Mr. Howard's posttrial motion for a new trial was also rejected. In denying the motion, the court considered the events of the trial, its length, comments of counsel throughout the trial, and whether such a statement made at the outset of trial would present a substantial likelihood of affecting the verdict. Our review of the record confirms the propriety of the decision. There is no substantial likelihood that the comments affected the verdict. *State v. Manthie, supra.* The jury was instructed that statements of counsel are not evidence and it is presumed to have followed the court's instructions. *State v. Grisby*, 97 Wn.2d 493, 499, 647 P.2d 6 (1982), *cert. denied*, 459 U.S. 1211 (1983). There has been no showing to the contrary here.[4]

---

[4]Mr. Howard's cited case, *Hilyard v. State*, 90 Okla. Crim. 435, 214 P.2d 953, 28 A.L.R.2d 961 (1950), is much stronger on its facts. There, specific statements in the prosecutor's opening argument were deemed prejudicial because all evidence against the defendant was circumstantial. Here, the statement was more general and the direct evidence of certain testimony from Pepper Howard was admissible.

Finally, Mr. Howard contends the court erred in granting the State's pretrial motion in limine to exclude evidence of a prior incident of dangerous behavior of a horse owned by Donna Howard which he contends may have caused her death. He argues the proffered testimony was relevant under ER 401 and not excludable under ER 403 because it was crucial to the central contention of the defense. *State v. Brown,* 48 Wn. App. 654, 739 P.2d 1199 (1987).

The State argues the court properly ruled the testimony was irrelevant due to remoteness, its complete lack of similarity to Donna Howard's death, and the inability to determine whether the horse involved in the previous incident was also the horse alleged to be responsible for her death. We agree.

ER 401 provides:

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

*See State v. Renfro,* 96 Wn.2d 902, 639 P.2d 737, *cert. denied,* 459 U.S. 842 (1982); 5 K. Tegland, at 168. Evidence which is not relevant is not admissible. ER 402; 5 K. Tegland, at 175. ER 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . .

However, ER 403 does not extend to the exclusion of crucial evidence relative to the central contention of a valid defense. *State v. Brown, supra* at 660; 5 K. Tegland, at 246 n.3 (citing *United States v. Wasman,* 641 F.2d 326 (5th Cir. 1981)).

Here, the State moved in limine to exclude the testimony of Lisa and Marilyn Howard, the daughters of Donna and Russell Howard, regarding an incident which occurred approximately 6 months prior to Donna's death. The

defense proposed that Lisa and Marilyn be allowed to testify that Marilyn was riding Missy, one of two horses owned by the Howards, while Lisa watched:

Donna Howard then began walking the horse around the corral–meadow area holding onto the reins of the horse and then . . . for no apparent reason the horse went wild, kicking and bucking trying to get the child off of its back. Apparently Donna got hysterical and ran around the area trying to catch the horse. And . . . Lisa got so upset about it she would never get on the horse again.

The defense argued this incident was relevant because it showed: (1) the horse was erratic and potentially dangerous and out of Donna Howard's control, therefore, showing her inability to predict behavior of horses which she supposedly knew how to control; (2) it would support the theory that Donna's death was caused by a horse kick; and (3) it would rebut anticipated prosecution arguments emphasizing Donna's expertise with horses. In granting the State's motion to exclude, the court analogized to ER 404 and stated this one specific incident did not show a pattern of behavior or that the horse was dangerous or different from any other horse and therefore the evidence was irrelevant. We agree with the trial court.

Deputy Ron Ward testified he was told at the scene that the ambulance crew closed the gate to keep animals in the pasture (away from the corral and loafing shed area). Ambulance attendant Richard Andring testified there were horses in the area, but not within the loafing shed when he arrived. While this testimony indicates horses likely had access to Donna Howard at the time she was injured, there is no evidence beyond speculation that Missy was involved in her death. Mr. Howard cites two civil cases which are factually distinguishable. In both *Grissom v. Hofius,* 39 Wash. 51, 80 P. 1002 (1905) and *Tamburello v. Jaeger,* 176 So. 2d 707 (La. Ct. App. 1965), *aff'd,* 249 La. 25, 184 So. 2d 544 (1966), the animals involved could be specifically identified as the ones inflicting injury. Such is not the case here. There was no abuse of discretion.

We hold that Mr. Howard received a fundamentally fair trial. The judgment is affirmed.

THOMPSON, C.J., and MUNSON, J., concur.

Reconsideration denied August 18, 1988.

Review denied by Supreme Court March 7, 1989.