[No. 9355-3-II.   Division Three.   June 4, 1987.]

THE STATE OF WASHINGTON, *Respondent*, v. NORMAN
WILLIS NEWCOMER, *Appellant*.

*Robert W. Huffhines, Jr.,* for appellant (appointed counsel for appeal).

*Henry R. Dunn, Prosecuting Attorney,* and *Robin M. Force, Deputy,* for respondent.

THOMPSON, A.C.J.*—Norman Newcomer appeals his conviction for two counts of first degree robbery, contending the trial court erred in not dismissing both counts based on: (1) violation of his Sixth Amendment speedy trial right; (2) running of the statute of limitation on count 2; and (3) precharging delay on count 2 violated his rights to due process under the Fifth and Fourteenth Amendments. He also assigns error to the trial court's denial of his motion to expend public funds for hiring a defense psychiatric expert, and contends he was denied effective assistance of counsel. We affirm.

On October 5, 1980, the bartender of the Oregon Way Tavern in Longview, Washington, was robbed at gunpoint by a customer who waited in the bar until closing time. Later, on October 18, 1980, a Stop 'N Go market in North Kelso was also robbed by a lone gunman. The victims in both robberies identified Norman Newcomer's photograph

---

*This case was heard by a panel of Division Three judges sitting in Division Two.

from a photo lineup.

An information was filed October 20, 1980, alleging Mr. Newcomer committed the Oregon Way Tavern robbery. On October 21, 1980 an arrest warrant was obtained.

Thereafter, Cowlitz County authorities learned that Mr. Newcomer was arrested November 10, 1980, for an offense in Oregon, and sentenced to Oregon State Penitentiary February 6, 1981, for that offense. The Cowlitz County Sheriff's office wrote to the Oregon State Penitentiary on February 9, 1981, enclosing the October 21, 1980 arrest warrant, stating: "Please use our warrant as a detainer for our department. We would like to extradite Mr. Newcomer to our jurisdiction on local charges. Please advise when he would be available for transport." The superintendent of the penitentiary acknowledged the detainer on February 23, 1981, and provided the Cowlitz County Sheriff with information on Mr. Newcomer's sentence and anticipated release date.

On June 5 and June 17, 1981, Mr. Newcomer wrote Judge Hallowell of the Cowlitz County Superior Court asking help in getting the detainer dropped or held in abeyance, because he wished to take advantage of the mentally–emotionally disturbed program at Oregon State Hospital; with a detainer in place, rehabilitative programs were denied prisoners at the Oregon Penitentiary. The deputy prosecutor for Cowlitz County wrote a reply to Mr. Newcomer on June 30, 1981, saying he had no intention of dropping the matter and suggesting the defendant forward the necessary paper work so that the matter could be adjudicated. Later, after more letters, the detainer was lifted as requested by Mr. Newcomer. The record does not indicate whether the defendant participated in the mentally disturbed program.

Upon his release from the Oregon prison, he was arrested and brought back to Washington to be tried on the charge already filed, alleging he robbed the Oregon Way Tavern. A second amended information was filed on May 16, 1985, charging him for the first time with commission of the Stop

'N Go robbery. Mr. Newcomer's attorney moved to dismiss count 1 on constitutional speedy trial grounds, and moved to dismiss count 2 on due process and statute of limitation grounds. The motions were denied.

On July 17, 1985, Mr. Newcomer filed a motion for leave to enter a plea of not guilty by reason of insanity, and for an order committing the defendant to Western State Hospital for evaluation. On July 18, 1985, Mr. Newcomer filed a formal written plea of not guilty by reason of insanity. The court granted the commitment request to Western State Hospital for observation, and a report was obtained. The report indicated Mr. Newcomer was competent to stand trial and sane at the time the offenses were committed. The court refused to expend further public funds for another psychiatric evaluation. Mr. Newcomer's counsel attempted to obtain psychiatric evaluations from Oregon authorities, but was denied access.

A jury trial was held on the two counts of robbery in the first degree. Mr. Newcomer refused to attend. He was convicted and sentenced to two 30–year terms in the state prison, to run consecutively.

The first issue is whether Mr. Newcomer's constitutional right to a speedy trial was violated by a trial 5 years after the information was filed, during which 5 years he was imprisoned on other charges in another state. This issue involves the relationship of federal and state constitutional rights to a speedy trial with the Interstate Agreement on Detainers (IAD), RCW 9.100.010 *et seq.* It does not involve compliance with CrR 3.3 because CrR 3.3(g)(6) excludes the time during which a defendant is detained in jail or prison outside Washington.[1]

When a person is incarcerated in another jurisdiction, the possibility a long delay in going to trial will impair his abil-

---

[1]For this reason, *State v. Peterson,* 90 Wn.2d 423, 585 P.2d 66 (1978) is inapplicable. It held RCW 9.100 did not conflict with CrR 3.3 and that prosecutors must comply with CrR 3.3 time limits. CrR 3.3(g)(6) was added by amendment in 1980, subsequent to *Peterson.*

ity to defend himself is markedly increased. For this reason, the Supreme Court has required that states make a diligent good faith effort to bring the defendant back for trial. *Dickey v. Florida,* 398 U.S. 30, 26 L. Ed. 2d 26, 90 S. Ct. 1564 (1970); *Smith v. Hooey,* 393 U.S. 374, 21 L. Ed. 2d 607, 89 S. Ct. 575 (1969). States usually accomplish this through adoption and utilization of the interstate detainer compacts.[2] The purpose of these compacts is: "to encourage the expeditious and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations or complaints". IAD, article 1; RCW 9.100.010. Action can be initiated by either the prisoner or the "receiving state" under articles 3 and 4 of RCW 9.100.010. *See State v. Peterson,* 90 Wn.2d 423, 430, 585 P.2d 66 (1978); *State v. Gilchrest,* 37 Wn. App. 531, 534, 681 P.2d 865 (1984). Article 3 requires the prisoner to deliver "to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment . . ." Article 4 allows the appropriate officer of the "receiving state", *i.e.,* where the untried indictment is pending, to request temporary custody of the prisoner.

While the agreement itself places no responsibility on a receiving state to bring the prisoner to trial, absent an article 3 request by the prisoner or actual custody in the receiving state pursuant to an article 4 temporary custody request, the fact a defendant is in prison in another jurisdiction and the minimal requirements of the IAD provisions do not relieve the State of its Sixth Amendment responsibilities. *Smith v. Hooey, supra; United States v. Dowl,* 394 F. Supp. 1250 (D. Minn. 1975); *see also State v. Dean,* 42 Md. App. 155, 399 A.2d 1367, 1372 (1979); *People v. Rodriguez,* 47 Mich. App. 483, 209 N.W.2d 441 (1973). ■ It is impossible to determine with clinical precision

---

[2]Washington adopted the IAD in 1967. *See* RCW 9.100.010–.080. Oregon adopted the IAD in 1973. *See* Or. Rev. Stat. §§ 135.775–.793 (1973).

when an accused's constitutional speedy trial right has been denied. *Barker v. Wingo,* 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182, 2187 (1972). For this reason, the United States Supreme Court, in *Barker,* created a balancing test to be applied on an ad hoc basis. The factors to consider are: (1) length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker,* 407 U.S. at 531. None of the four factors identified by the Court were regarded as either a necessary or sufficient condition to a finding of deprivation of the right to speedy trial.

■ Application of the 4–part *Barker* balancing factors is complicated in this case by what the State characterizes as Mr. Newcomer's waiver of his speedy trial rights. The State argues his letters asking the court and prosecutor to drop the arrest warrant and detainer effectively waived any speedy trial right. However, a waiver of the constitutional right to a speedy trial must be knowing, intelligent, and voluntary and will not be presumed. *Barker; In re James,* 96 Wn.2d 847, 851, 640 P.2d 18 (1982); *State v. Williams,* 87 Wn.2d 916, 557 P.2d 1311 (1976). A defendant has no duty to bring himself to trial, nor is he under a duty to demand a speedy trial at the expense of otherwise waiving the right. *Barker,* 407 U.S. at 531; *State v. Wernick,* 40 Wn. App. 266, 271, 698 P.2d 573 (1985); *McQueary v. State,* 21 Wn. App. 658, 664, 585 P.2d 1197 (1978). There is no clear showing Mr. Newcomer understood his request was a waiver of his speedy trial right for the time between his June 1981 letters and his trial in October 1985. We find his request was not a waiver of his right to a speedy trial. However, his conduct is certainly relevant when applying the four *Barker* balancing factors.

The length of delay, approximately 5 years, is long enough to presumptively affect Mr. Newcomer's rights in that he was "available", if the State had pursued the IAD article 4 procedures. *See Barker,* 407 U.S. at 531–32. The reason for the delay can be determined by examining the events surrounding Mr. Newcomer's request to drop the

detainer. The State's inaction from February 9, 1981, when it notified Oregon and lodged its detainer, to June 5, 1981, when Mr. Newcomer wrote his first letter to Judge Hallowell, is inexplicable in that the State's communication with Oregon clearly invoked article 4 of the IAD. Oregon then had 30 days before the request had to be honored. While Oregon acknowledged the request on February 23, 1981, no further action was taken by the Cowlitz County prosecutor until June 30, 1981, when by letter the prosecutor informed Mr. Newcomer he had no intent to drop the matter and suggested the prisoner "forward the necessary paperwork", alluding to the article 3 procedure. Also, there is no indication Oregon authorities informed Mr. Newcomer pursuant to IAD article 3(c) not only of the source and contents of the detainer, but of his right to request final disposition of the charge, prior to his receipt of the prosecutor's letter.

As noted by Mr. Newcomer, a prime purpose of the IAD procedures is to remove the difficulty and uncertainty surrounding detainers based on untried indictments. IAD, article 1; *United States v. Mauro,* 436 U.S. 340, 360–61, 56 L. Ed. 2d 329, 98 S. Ct. 1834, 1847 (1978). Mr. Newcomer's reasons for asking the State to drop the detainer are consistent with this purpose; an inactive detainer will interfere with a prisoner's ability to participate in treatment and rehabilitation programs. Oregon would not allow Mr. Newcomer to participate in its prison mental health program while the indictment and detainer remained unresolved. While the delay was not a deliberate effort to hamper the defendant, the State offers no valid reason for the initial nonaction, such as rejection of its article 4 request by Oregon. Thus, the "reason for delay" factor must be weighted in defendant's favor.

The third factor, assertion of the right by the defendant, did not occur until Mr. Newcomer moved for dismissal of count 1 on May 29, 1985. Although, as noted, demand is not necessary, failure to assert the right makes it difficult for a defendant to prove a denial of his speedy trial rights. *Barker,* 407 U.S. at 532. While the *Barker* Court

rejected a demand/waiver rule, it did place some responsibility on an accused to assert his rights, and noted delay attributable to the accused may constitute waiver. *See also People v. Fischer,* ___ Cal. App. 3d ___, 234 Cal. Rptr. 16 (1987); *Capers v. United States,* 403 A.2d 1155 (D.C. 1979). Mr. Newcomer must bear considerable responsibility for causing the delay since it was his request that the detainer be dropped which precluded temporary custody for trial in Washington under article 4 of the IAD.

The fourth factor, prejudice, is often the most important. The Supreme Court has identified three interests of defendants which should be considered in assessing this element: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious." *Barker,* 407 U.S. at 532. Here, the first two prejudice considerations are not present; he was already incarcerated for another crime.

█ As to the possibility his defense was impaired, Mr. Newcomer entered a plea of not guilty by reason of insanity, and contends the 5-year delay makes proof of his insanity particularly difficult. While he was examined at Western State Hospital, he argues an examination closer to the time of the alleged offenses was necessary, and the delay frustrated this. In addition, the trial court refused to expend public funds for any further psychiatric evaluations which he argues compounded the prejudice. Prejudice is not shown by these facts. The Western State report found no reason to believe he was insane in October 1980. The report of Dr. Perlstein attached to Mr. Newcomer's motion for order of referral to Western State Hospital, and completed pursuant to an evaluation of the defendant at Oregon State Penitentiary in February 1981, fails to make a minimal showing that sanity would be at issue. No other evidence presented casts doubt on this conclusion. The

presence of possible prejudice to his insanity defense is purely speculative.

A potential alibi witness, Mr. Newcomer's mother, died April 2, 1985 before counsel could question her. The defendant alleges there is an indication she had relevant information about his whereabouts in October 1980. The trial court, however, was not persuaded by the unsubstantiated relevance of the mother's lost testimony. After reviewing the evidence presented to the trial court regarding the mother's potential testimony, we are not persuaded any prejudice is shown, especially in light of the strong eyewitness identification.

Finally, a review of the record indicates the memory of the key witnesses was not affected to any appreciable extent in their identification of Mr. Newcomer. They identified him by photo lineup at the time of the crimes and, although 5 years had passed, were still certain he was the perpetrator when asked at trial. Thus, this potential prejudice factor does not weigh in defendant's favor.

Our weighing of the *Barker* factors leads us to the conclusion Mr. Newcomer was not denied his constitutional rights to a speedy trial. Though the State must make a diligent good faith effort to bring defendants to this state for trial when incarcerated in another jurisdiction, and although the State could have returned Mr. Newcomer to this state using IAD article 4 procedures, the prosecution cannot be penalized where Mr. Newcomer's own request prompted the State's inaction, and no prejudice resulted.

The next issue is whether count 2 of the information should have been dismissed because either: (1) the statute of limitation should not be tolled when the defendant was "available" under the IAD; or (2) precharging delay violated Mr. Newcomer's due process rights.

RCW 9A.04.080 tolls the running of the statute of limitation when a person charged is "not usually and publicly resident within this state . . ." *State v. Ansell,* 36 Wn. App. 492, 496, 675 P.2d 614 (1984) held mere absence from Washington enough to toll the statute. Here, Mr. New-

comer's incarceration tolled the statute of limitation. While the IAD provided a procedure for making Mr. Newcomer "available", *Ansell* noted that under the applicable tolling statute "the State does not have a duty to bring extradition proceedings when it learns of defendant's whereabouts". *Ansell*, at 496. Thus, the argument that the IAD should prevent tolling is without merit.

The United States Supreme Court held, in *United States v. Marion*, 404 U.S. 307, 30 L. Ed. 2d 468, 92 S. Ct. 455 (1971), that the Sixth Amendment speedy trial provision has no application until "the putative defendant in some way becomes an 'accused' . . ." *Marion*, 404 U.S. at 313. *See also United States v. Loud Hawk*, 474 U.S. 302, 88 L. Ed. 2d 640, 106 S. Ct. 648, 654, *reh'g denied*, 475 U.S. 1061 (1986); *United States v. MacDonald*, 456 U.S. 1, 71 L. Ed. 2d 696, 102 S. Ct. 1497 (1982). Precharging delay is tested under the due process clause. *MacDonald; Marion; Ansell*, at 497; *State v. Haga*, 13 Wn. App. 630, 536 P.2d 648 (1975), *cert. denied*, 425 U.S. 959, 48 L. Ed. 2d 204, 96 S. Ct. 1740 (1976).

██ Under this test, the precharging delay of 5 years must have actually prejudiced Mr. Newcomer's defense of count 2. *Ansell*, at 497; *Haga*. The prejudice must be sufficient to overcome the legislative intent to prosecute the crime as evidenced by the absence of a statute of limitation. As we have already indicated, we do not find the 5–year delay prejudiced Mr. Newcomer's defense. Thus, no violation of his due process rights is demonstrated.

The next issue is whether the trial court erred in denying the defendant's motion for public funds for his own psychiatric expert. Mr. Newcomer contends the Western State Hospital examination and report were inadequate in that they only addressed the issue of his competency to stand trial. He also attacks the reliability of the determination, claiming the examination was cursory. He maintains the refusal to permit expenditure of public funds for an independent psychiatric exam, coupled with the inadequate

Western State Hospital report and his inability to gain access to Oregon presentence reports, severely limited his ability to present an insanity defense.

When a plea of not guilty by reason of insanity is entered, the trial court on its own motion or on the motion of any party must order either an examination by two qualified experts or commitment to a hospital or other suitable facility for purposes of evaluating defendant's mental condition. *See* RCW 10.77.060. Here, that was done. The court order specifically required Western State Hospital "to determine his sanity at the times that the acts were committed which was in October, 1980, in accordance with RCW 10.77.060(3)". The report, while also referring to competency to stand trial, concludes:

> There is no reason to believe that he was psychotic at the time of the commission of the alleged crimes, or that he was unable to distinguish right from wrong or to appreciate the nature and quality of his actions at the time of his alleged offense.

There is nothing to suggest the examination was substandard.

■ Mr. Newcomer's reference to RCW 10.77.060(2) does not support his argument the court must provide further defense psychiatric experts *after* an examination report has been completed on his own motion. That section, read together with RCW 10.77.020(2), permits appointment of a defense expert *prior* to appointment of the examination panel. *State v. Griffith,* 91 Wn.2d 572, 578–79, 589 P.2d 799 (1979). Mr. Newcomer did not request a defense psychiatric expert until after the Western State Hospital report was received.

Additionally, as already explained, Mr. Newcomer failed to make any threshold showing that sanity was likely to be a significant factor in his defense. As noted by the United States Supreme Court in *Ake v. Oklahoma,* 470 U.S. 68, 83, 84 L. Ed. 2d 53, 105 S. Ct. 1087, 1097 (1985), in finding a constitutional requirement to provide access to psychiatric assistance on the issue of defendant's sanity:

This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own.

In addition, *Ake* makes clear a defendant must "make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense" before the court is constitutionally required to provide a defense psychiatric expert at public expense. *Ake,* at 82–83. The trial court properly exercised its discretion in rejecting further expenditure of public funds for additional psychiatric evaluations.

Finally, Mr. Newcomer contends he was denied effective assistance of counsel. The test for determining whether a defendant in a criminal case has been denied effective assistance of counsel is whether: (1) after considering the entire record, he or she was denied "effective representation"; and (2) he or she was prejudiced by such ineffectiveness. *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052 (1984); *State v. Mak,* 105 Wn.2d 692, 731, 718 P.2d 407, *cert. denied,* 107 S. Ct. 599 (1986).

Our review of the record does not indicate the necessary deficient performance of counsel. Trial counsel was faced with a difficult situation compounded by Mr. Newcomer's refusal to be present at trial and assist in his defense. He was not denied effective assistance of counsel.

Affirmed.

GREEN and MUNSON, JJ., concur.

Reconsideration denied July 8, 1987.

Review denied by Supreme Court November 4, 1987.