IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30721-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALLEN ROBERT TREVINO, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Allen Trevino was convicted of first degree rape of a child and communicating with a minor for immoral purposes. Based upon the jury's finding that Mr. Trevino used his position of trust to facilitate commission of the rape, the court imposed an exceptional sentence of 168 months.

Mr. Trevino challenges whether the State proved the element required to prove first degree child rape that the victim was under 12 years of age, claiming both that the jury instruction was flawed and that the evidence was insufficient. He also argues that his right to a unanimous verdict on the child rape charge was not safeguarded, that the 2-year statute of limitations on the communication with a minor charge ran before the time he was charged, and that the trial court lacked authority to impose an exceptional sentence given the unconstitutionality of the sentencing system in place when the crime was committed. We find no error and affirm.

No. 30721-2-III
*State v. Trevino*

FACTUAL BACKGROUND AND PROCEDURE

In early December 2010, B.A.,[1] who was by then 18 years old, told her grandmother that years earlier, Allen Trevino, who lived in Oregon but had maintained an off-and-on relationship in Washington with B.A.'s mother since B.A. was in the fourth grade, had sexually assaulted her. The grandmother, Lynnell Robertson, insisted that B.A. tell Ms. Robertson's daughter—B.A.'s mother—what Mr. Trevino had done. Ms. Robertson asked B.A.'s mother to come to her home, where she had B.A. repeat her allegations against Mr. Trevino. B.A.'s mother, upset by the allegations, returned to her own home and confronted Mr. Trevino, who was visiting her at the time. Ms. Robertson had accompanied her daughter back to speak with Mr. Trevino and called police when the situation escalated into an altercation.

Mr. Trevino was charged with rape of a child in the first degree, in the alternative with child molestation in the first degree, and with communicating with a minor for immoral purposes. The child rape charge required that the State allege and prove that the rape was committed when B.A. was less than 12 years old and, since B.A. was born on December 13, 1991, the State was required to prove that it occurred before December 13,

_____

[1] The victim's initials are used to protect her identity, consistent with a general order of this court. *See* General Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012) *available at* http://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=017&div=III.

2

2003. From the time of the first information, however, the State based its charges on acts it alleged had occurred between January 1, 2002 and *December 12, 2004*, rather than *December 12, 2003.*

At trial, B.A. testified that Mr. Trevino had subjected her to sexual conduct between her fourth grade and seventh grade years of school, during which she, her mother, and two sisters had changed residences several times—living first at a couple of locations in Richland, and then moving to Portland for a time before moving back to the Tri-Cities. She testified that her family had moved to Richland "[a]bout the middle of fourth grade" and that she attended the second half of fourth grade and all of fifth grade at Marcus Whitman Elementary School. Report of Proceedings (RP) (Dec. 13, 2011) at 105-06. She then transferred to Chief Joseph Middle School, also located in Richland, where she attended sixth grade. She testified that her mother moved her and her sisters to Portland in 2004, after her sixth grade year, and that they all lived for a time in Mr. Trevino's apartment. She attended the first part of seventh grade at Lane Middle School in Portland after which her mother returned with her daughters to Richland, where B.A. completed the end of her seventh and all of eighth grade at Chief Joseph Middle School.

B.A. testified to several incidents of abuse by Mr. Trevino. The first was when Mr. Trevino read to her a pornographic story about incest between a brother and sister. She testified that Mr. Trevino read the story to her when her family was living at a house

3

on Snow Street in Richland, which is where they lived when she was in the fourth and fifth grade.

She testified that the second incident occurred after the family had moved to a home on Jadwin Street in Richland. According to B.A., she was lying on her mother's bed watching a movie. She was wearing a top and a pair of shorts and was lying on her stomach because her back was sore. Mr. Trevino came into the room, sat beside her on the bed and, reaching under her top, began rubbing her back. He then ran his hand up the inside of her thigh and inserted his finger into her vagina. Shocked, she moved away. She stated that this incident occurred in the beginning of her sixth grade year, when she was 11 years old. She explained that she could place the incident in the fall of her sixth grade year because they were living on Jadwin Street at the time and "the leaves were orange." *Id.* at 114.

B.A. testified to two other incidents that occurred after she turned 12. The trial court allowed her to testify to the incidents, which it treated as uncharged (despite the breadth of the charging period) after engaging in an ER 404(b) analysis. The court concluded that the events were admissible as evidence of Mr. Trevino's lustful disposition toward B.A.

B.A. testified that in July 2004, while she was 12 years old and after she, her mother, and her sisters moved to Portland following her sixth grade year, Mr. Trevino approached her after she got out of a shower, wrapped in a towel, and had touched her

4

breast. She testified that in September 2004, while she, her mother, and sisters were still living at Mr. Trevino's Portland apartment, Mr. Trevino performed oral sex on her and made her perform oral sex on him one night while her mother was at work.

In B.A.'s December 2010 statement to police, she provided some dates that were inconsistent with her testimony at trial. Specifically, she told Detective Damon Jansen that nothing had happened until she was in the sixth grade in 2004-2005. A "2004-2005" time frame would have meant that she was 12 going on 13 during the school year in question—too old to be the victim of first degree child rape. Mr. Trevino's lawyer cross-examined her at trial about this statement made to Detective Jansen. While she admitted having made the statement, she explained that she had been confused.

On redirect examination, B.A. was shown the pertinent page of the transcript of her interview by Detective Jansen. She again admitted that she had initially told the detective she was in the sixth grade in 2004 and 2005 but elaborated on the source of her confusion when she spoke to Detective Jansen:

> Q. Just read half of it . . . and I'm going to ask to refresh your memory how those 2004 and 2005 dates came about. So, after reading that, who is it that thought—that thought you were in the sixth grade in 2004 and 2005?
> A. My mom.
> Q. Is that what you told Detective Jansen?
> A. Yes.
> Q. But you're very clear this incident occurred in the sixth grade, in the beginning of the sixth grade?
> A. Yes.
> Q. And have always been clear about that?

5

A. Yes.

Q. Everybody asks you about all these different people that you've spoken to about this incident.

Is it fair to say that this has been a hard thing to talk about and remember?

A. Yes.

*Id.* at 153-54.

The discrepancy in her statement to Detective Jansen was further explored in recross-examination. B.A. repeated that her mother had thought that the incident occurred around 2004/2005. Mr. Trevino's lawyer then asked,

Q. But distinctly, the issue is that nothing happened until 2004 and 2005?

A. That's what I had thought until I had further—how do I say, further evaluated everything and thought about everything.

Q. So, you had believed that it happened maybe 2005/2006, and after talking with her—

A. No, my mom thought that. I was in sixth grade then.

Q. And your mom had thought nothing had happened until 2004?

A. My mom didn't know anything happened.

*Id.* at 155. Finally, in response to the State's questioning on further redirect, B.A. again testified that when she initially spoke with Detective Jansen she could not say which years she was in sixth grade, she just knew that she was in sixth grade when it happened.

The jury's instructions on the crime of first degree rape included instruction 9, defining first degree rape of a child, which advised the jury that to find Mr. Trevino guilty the State must prove that the victim was less than 12 years old at the time he committed the crime. The to-convict instruction, instruction 16, also set forth the required element

of a victim younger than age 12 but at the same time included the charging period, which

extended beyond age 12:

> To convict the defendant of the crime of rape of a child in the first
> degree, each of the following elements of the crime must be proved beyond
> a reasonable doubt:
> (1) That *during the time intervening between January 1, 2002 and
> the 12th day of December 2004, the defendant had sexual intercourse* with
> [B.A.];
> (2) That [*B.A.*] *was less than twelve years old at the time of the
> sexual intercourse* and was not married to the defendant;
> (3) That [B.A.] was at least twenty-four months younger than the
> defendant; and
> (4) That this act occurred in the State of Washington.
> If you find from the evidence that each of these elements has been
> proved beyond a reasonable doubt, then it will be your duty to return a
> verdict of guilty.

Clerk's Papers (CP) at 185 (emphasis added). Mr. Trevino did not object to the

instruction.

The jury found Mr. Trevino guilty of first degree rape of a child and

communicating with a minor for immoral purposes. It also returned a special verdict

finding that Mr. Trevino had "use[d] his position of trust to facilitate the commission of

the crime." CP at 205. Based on the jury's finding of the aggravating factor, the court

imposed an exceptional sentence of 168 months on the first degree rape of a child

charge—21 months above the standard range. Mr. Trevino appeals.

## ANALYSIS

Mr. Trevino challenges whether the State proved the element required to prove

first degree child rape that the victim was under 12 years of age, claiming both that the jury instruction was flawed and that the evidence was insufficient. He argues that his right to a unanimous verdict on the child rape charge was not safeguarded, that the 2-year statute of limitations on the communication with a minor charge ran before the time he was charged, and that the trial court lacked authority to impose an exceptional sentence given the unconstitutionality of the sentencing system in place when the crime was committed. We address his challenges in turn.

### I. *Proof that B.A. was under age 12 at the time of the first degree rape*

Mr. Trevino contends that he cannot be guilty of either first degree rape or the alternative charge of first degree child molestation because the State presented insufficient evidence that B.A. was under the age of 12 when the act constituting rape occurred. His opening argument on this score is two-pronged: he contends that the trial court's instructions misled the jury as to the elements of first degree rape of a child and that the evidence presented at trial was insufficient to support the jury's verdict.

Mr. Trevino's complaint about the jury instruction is raised for the first time on appeal, which it may be, since a to-convict instruction is the "'yardstick' by which to determine a defendant's guilt or innocence." *State v. Davis*, 154 Wn.2d 291, 306, 111 P.3d 844 (2005) (quoting *State v. Mills*, 154 Wn.2d 1, 6, 109 P.3d 415 (2005)), *aff'd*, 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Unlike a trial court's choice of jury instructions, which we review for abuse of discretion, an alleged error of law in a jury

8

instruction is reviewed de novo. *Boeing Co. v. Key*, 101 Wn. App. 629, 632, 5 P.3d 16 (2000). Taken in their entirety, jury instructions "must inform the jury that the State bears the burden of proving every essential element of a criminal offense beyond a reasonable doubt." *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). The to-convict instruction must contain all of the elements of the crime. *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997) (quoting *State v. Emmanuel*, 42 Wn.2d 799, 819, 259 P.2d 845 (1953)).

Mr. Trevino claims that the jury instructions failed to ensure that the jury found beyond a reasonable doubt that he raped B.A. before her 12th birthday because the charging period stated in the to-convict instruction extended to December 12, 2004. The State concedes that the charging period stated in the instruction includes a year following B.A.'s 12th birthday but it argues that the instruction also clearly informed the jury that it must find that the act occurred when B.A. was under the age of 12. According to the State, the inclusion of the charging period misstates the elements of first degree rape, but only by including as an element something that is not an element: that the crime occurred "during the time intervening between January 1, 2002 and the 12th day of December 2004." The consequence of this sort of misstatement—including an unnecessary element—is that "the State assumes the burden of proving otherwise unnecessary elements . . . when [they] are included without objection in the 'to convict' instruction." *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998).

9

"[W]e have held consistently that it is prejudicial error to give irreconcilable instructions upon a material issue in the case." *Hall v. Corp. of Catholic Archbishop of Seattle*, 80 Wn.2d 797, 804, 498 P.2d 844 (1972). Where instructions are inconsistent or contradictory on a material point, their use is prejudicial because it is impossible to know what effect they had on the verdict. *Id.* Here, however, the reference in the to-convict instruction of a charging period that extended beyond B.A.'s 12th birthday was not inconsistent or contradictory. It was included as an element numbered (1), whereas the requirement that B.A. be less than 12 years old at the time of the sexual intercourse was included as a separate element numbered (2). The numbered elements were introduced by the language, "To convict the defendant of the crime of rape of a child in the first degree, *each of the following elements* of the crime must be proved beyond a reasonable doubt." CP at 185 (Instruction 16) (emphasis added). The instruction concluded with the language, "If you find from the evidence that *each of these elements* has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty." *Id.* (emphasis added).

While the elements numbered (1) and (2) were different from each other, that does not make them inconsistent or contradictory any more than the fact that the elements numbered (3) and (4)[2] were different from each other and from the elements numbered

---

[2] That B.A. was at least 24 months younger than Mr. Trevino, and that the act occurred in the State of Washington.

(1) and (2). The jury was instructed, clearly, that it must find "each" element to have been proved, and "[j]uries are presumed to follow the court's instructions absent evidence to the contrary." *State v. Dye*, 170 Wn. App. 340, 348, 283 P.3d 1130 (2012), *aff'd*, 178 Wn.2d 541, 309 P.3d 1192 (2013).

Mr. Trevino next argues that the evidence was insufficient to establish that B.A. was under the age of 12 at the time of the second incident, the digital penetration that was the basis of the child rape charge, arguing that "there was no clear evidence as to whether any one of the acts took place before December 13, 2003." Reply Br. of Appellant at 5. This is an unrealistic characterization of the evidence, given the standard of review.

"A defendant's challenge to the sufficiency of the evidence requires the reviewing court to view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt." *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). In determining whether the necessary quantum of proof exists, this court need not be convinced of the defendant's guilt beyond a reasonable doubt, but only that substantial evidence supports the State's case. *State v. Galisia*, 63 Wn. App. 833, 838, 822 P.2d 303 (1992), *abrogated on other grounds by State v. Trujillo*, 75 Wn. App. 913, 883 P.2d 329 (1994).

At trial, B.A. testified that Mr. Trevino inserted his finger into her vagina when she was living in the apartment on Jadwin Street. She stated that the incident occurred in

11

the beginning of her sixth grade year, when she was 11 years old. When asked why she remembered that it occurred during the beginning of her sixth grade, as opposed to the end, she responded, "[B]ecause when we moved to Jadwin I wasn't in school for the first week because we, um, had a hard time getting me in there, and I remember it being like around fall. The trees were like—the leaves were orange. It wasn't snowing." RP (Dec. 13, 2011) at 113-14.

Mr. Trevino emphasizes those portions of B.A.'s testimony about the timing discrepancy that appear confused, refusing to recognize that she provided an arguably sufficient explanation of the discrepancy elsewhere, as recounted above.[3] While B.A. might have been clearer in some of her answers about the discrepancy, read as a whole, her testimony, along with other evidence, is sufficient to permit a rational trier of fact to find that she was under the age of 12 at the time of the rape. Throughout the trial, she was adamant that the digital penetration had occurred in the fall of her sixth grade year. In order to further address the discrepancy in B.A.'s initial conversations with the

---

[3] Mr. Trevino also mischaracterizes the prosecutor's closing argument as suggesting that as long as B.A. was under 12 during any part of the charging period, the jury could find him guilty. The prosecutor's comment, "The charging period ends when she turns 13," was immediately preceded by its statement that B.A. "told you that the defendant and the massage incident happened in the beginning [of] the sixth grade." RP (Dec. 15, 2011) at 98. Although the prosecutor stated that this case was "about a 12 year old little girl," its comment did not imply that B.A. was 12 at the time of the digital penetration incident. *Id.* In context, the State is reasonably understood to have been asking the jury to bear in mind that B.A. was a child during the time frame that she failed to report the abuse to her mother or other adults.

detective and clarify the date on which this incident occurred, the State used B.A.'s grade in school as a reference point, demonstrating through B.A.'s testimony that her birthday always fell in the middle of the school year and, starting with her anticipated high school graduation date, established that B.A. was 18 in 2010 and therefore had to have turned 12 during the middle of her sixth grade year. This was also consistent with B.A.'s testimony that the family moved to Portland in 2004, which she testified was *after* her sixth grade year.

The credibility of B.A.'s testimony and the weight to give the evidence presented at trial were matters for the jury to decide. "The trier of fact is the sole and exclusive judge of the evidence," *State v. Hathaway*, 161 Wn. App. 634, 645, 251 P.3d 253 (2011), and the court "must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004). While the evidence as to the timing of the family's moves and the incidents of sexual conduct was imprecise and one statement made by B.A. to Detective Jansen was legitimate fodder for impeachment, there was more than sufficient consistent evidence of the general timing of events to prove the element of an under-12-year-old victim beyond a reasonable doubt.[4]

---

[4] Mr. Trevino also submits that it is general practice, where there is conflicting evidence whether a victim was under age 12, for the prosecutor to end the charging period for first degree rape on the victim's 12th birthday and then charge lesser included offenses for any act that might have occurred after the victim turned 12. Reply Br. of

*II. Jury unanimity as to first degree rape*

As an apparent third prong to Mr. Trevino's evidence sufficiency challenge, he argues—particularly in his reply brief—that the State introduced evidence of several acts of sexual assault but failed either to elect which act it relied upon for the first degree rape charge or offer a unanimity instruction. While he ties this to his sufficiency of evidence challenge (perhaps confusing "multiple acts" cases with "alternative means" cases) he ultimately contends that this was a case in which either election of a particular act or a *Petrich*[5] instruction was required to safeguard his constitutional right to a unanimous verdict.

Although "a contention presented for the first time in the reply brief will not receive consideration on appeal," *Fosbre v. State*, 70 Wn.2d 578, 583, 424 P.2d 901 (1967), courts construe the rules of appellate procedure liberally and may exercise discretion to consider the issue. RAP 1.2(a). Moreover, although Mr. Trevino did not propose a *Petrich* instruction at trial, the issue is one of constitutional magnitude because it impinges upon his right to trial by jury, and may therefore be raised for the first time on appeal. *State v. Jones*, 71 Wn. App. 798, 821, 863 P.2d 85 (1993).

---

Appellant at 5. Although complaining that the State failed to do so in this case, he provides no authority or argument why a deviation from this alleged "general practice" would be grounds for reversal. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration," *Hathaway*, 161 Wn. App. at 650 n.10; the court need not consider the issue.

[5] *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984).

14

"In cases where several acts are alleged, any one of which could constitute the crime charged, the jury must unanimously agree on the act or incident that constitutes the crime." *State v. Hayes*, 81 Wn. App. 425, 430, 914 P.2d 788 (1996) (citing *Petrich*, 101 Wn.2d at 572). In these "multiple acts" cases, "either the State [must] elect the particular criminal act upon which it will rely for conviction, or . . . the trial court [must] instruct the jury that all of them must agree that the same underlying criminal act has been proven beyond a reasonable doubt." *State v. Kitchen*, 110 Wn.2d 403, 411, 756 P.2d 105 (1988).

The unanimity concern arises only where several acts are alleged and any one of them could constitute the crime charged, however. That was not the case here. In *State v. Hanson*, 59 Wn. App. 651, 657, 800 P.2d 1124 (1990), the court set forth a three-prong analysis for determining whether *Petrich* is applicable; the third prong demonstrates why *Petrich* concerns are not implicated in this case:

> [D]oes the evidence disclose more than one violation of the statute? . . . If the evidence proves only one violation, then no *Petrich* instruction is required, for a general verdict will necessarily reflect unanimous agreement that the one violation occurred. On the other hand, if the evidence discloses two or more violations, then a *Petrich* instruction will be required, for without it some jurors might convict on the basis of one violation while others convict on the basis of a different violation. In the latter situation, the result is a lack of jury unanimity with respect to the facts necessary to support conviction, and a consequent abridgment of the right to jury trial.

(Footnotes omitted.)

Here, B.A. may have testified to four criminal acts by Mr. Trevino but only the second act—the digital penetration taking place during the fall of her sixth grade year—

15

was actually offered as the basis for the State's charge of first degree rape despite the two-year charging period. Only the second act *could* constitute first degree rape. The first act (the pornographic story) did not involve physical contact, let alone sexual intercourse. The last two acts, which were offered by the State as evidence of Mr. Trevino's "lustful disposition" toward B.A., occurred after B.A.'s 12th birthday. The trial court gave a limiting instruction that evidence of these last two "uncharged offenses" had been admitted "for the sole purpose of showing the defendant's alleged sexual desire for [B.A.], and should not be considered by you for any other purposes. The defendant is not on trial for any act, conduct, or offense not charged in the Information." CP at 176 (Instruction 7).

The State was clear that the second incident was the basis of the rape of a child charge. In closing argument, the prosecutor stated:

> Now, the rape of a child in the first degree case, this charge involves the massage of her lower back and when the hand went up her shorts and his hand went onto her vagina and his finger went inside her vagina. That is what this charge consists of.

RP (Dec. 15, 2011) at 71-72. This is not a case in which several criminal acts were alleged, any one of which could have constituted the first degree rape charged by the State. *Petrich* does not apply.

16

*III. Statute of limitations*

Mr. Trevino next argues that the State's charge for communication with a minor for immoral purposes was time barred. Under RCW 9A.04.080(1), no gross misdemeanor may be prosecuted more than two years after its commission.[6] The State's charge was based on Mr. Trevino's reading pornographic material to B.A. sometime in 2002, for which the statute of limitations would have run no later than December 13, 2004.

The State responds that Mr. Trevino fails to consider RCW 9A.04.080(2), which provides that the limitation period does not run during any time when the person charged is not "usually and publicly resident within this state." It contends that Mr. Trevino's residence in Oregon prevented the limitations period from running.

This court first addressed the meaning of RCW 9A.04.080's tolling provision in *State v. Ansell*, 36 Wn. App. 492, 675 P.2d 614 (1984). Relying on a leading Illinois case, the court explained that "'not usually and publicly resident'" simply means

---

[6] RCW 9A.04.080 provides in pertinent part:
(1) Prosecutions for criminal offenses shall not be commenced after the periods prescribed in this section.

. . . .

(i) No gross misdemeanor may be prosecuted more than two years after its commission.

. . . .

(2) The periods of limitation prescribed in subsection (1) of this section do not run during any time when the person charged is not usually and publicly resident within this state.

17

"'absent,'" whether or not a defendant is concealing himself or fleeing from justice. *Id.* at 494 (quoting *People v. Carman*, 385 Ill. 23, 52 N.E.2d 197 (1943)). It held that the limitations period was tolled despite the fact that the defendant's out-of-state address was known to authorities and that the defendant "was living openly and was available for prosecution at all times." *Id.* That construction of the tolling provision is now well settled. *E.g., State v. Newcomer*, 48 Wn. App. 83, 91-92, 737 P.2d 1285 (1987) (defendant's incarceration in another state tolled the statute of limitation even though he was available for prosecution). The limitations period remains suspended even if a defendant, while living elsewhere, visits Washington State periodically. *State v. McDonald*, 100 Wn. App. 828, 830, 1 P.3d 1176 (2000) (while living in New York, defendant continued to receive mail from Washington and returned to Washington several times a year to visit family and for work related activities).

Given that meaning of the tolling provision, Mr. Trevino was not "usually and publicly resident" within Washington during any period between 2002 and the time he was charged. Testimony at trial, including Mr. Trevino's own testimony, was that he consistently resided in Oregon. Mr. Trevino testified that B.A.'s mother wanted to live with her parents in Washington, and "I wasn't gonna leave Oregon." RP (Dec. 13, 2011) at 158. When asked whether he ever disconnected his ties with Oregon, Mr. Trevino stated, "No, I've always lived in Oregon." *Id.* Mr. Trevino did testify that he stayed with B.A.'s mother when he came to Pasco, Washington in 2002 for two weeks to get his

18

commercial driver's license but when questioned further about whether he lived with her

in the Tri-Cities, he responded:

> A No, I did not.
> Q Do you remember telling the detective in Portland that you lived with them for six months in the Tri-Cities?
> A No. I told them they lived down in Portland for six months. I told him I went to stay up there going to truck driving school.
> . . . .
> Q You would agree with me that you did live for some time in the Tri-Cities with [B.A.'s mother] and her girls; isn't that true?
> A No.
> Q So you did not live for approximately six months with them in the Tri-Cities?
> A Just like [she] did when you asked her[,] I just come up for a couple time a weekend and go back two three times a month.
> Q You were sitting over here yesterday and [B.A.'s mother] testified you practically lived with them when they were at Snow and Jadwin?
> A No, that's not correct.
> Q You never lived with them in the Tri-Cities?
> A I stayed [with] her and visited them but I've never continually lived with her.

RP (Dec. 14, 2011) at 11-13.

The statute of limitations did not bar prosecution of the charge of communication

with a minor for immoral purposes.

### IV. Exceptional sentence

Finally, Mr. Trevino argues that the trial court lacked authority to impose an

exceptional sentence because the procedure for imposing such a sentence that was in

place in 2003—when he committed first degree child rape—was later declared

19

unconstitutional in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). "A sentencing court's statutory authority under the SRA [Sentencing Reform Act of 1981, ch. 9.94A RCW] is a question of law, reviewed de novo." *State v. Parmelee*, 172 Wn. App. 899, 909, 292 P.3d 799 (2013), *review denied*, 177 Wn.2d 1027 (2014).

Under former RCW 9.94A.535 (2003) and former RCW 9.94A.530(2) (2002), trial courts were authorized to impose sentences outside the standard range if they found the existence of aggravating or mitigating factors by a preponderance of the evidence. The statute provided nonexclusive lists of aggravating and mitigating factors. *See* former RCW 9.94A.535. This procedure was invalidated in *Blakely*, in which the United States Supreme Court held that any fact that increases the standard range punishment, aside from that of a prior conviction, must be found by a jury beyond a reasonable doubt. 542 U.S. at 301. The Washington Legislature responded by amending the SRA in 2005 to provide for jury determinations of aggravating factors justifying exceptional upward sentences. LAWS OF 2005, ch. 68; 2005 FINAL LEGISLATIVE REPORT, 59th Wash. Leg., at 289; *State v. Pillatos*, 159 Wn.2d 459, 468, 150 P.3d 1130 (2007).

Under the amended version of the SRA, the court may impose a sentence outside the standard range if it finds, considering the purposes of the act, "that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535. The statute provides an exclusive list of permissible aggravating factors. RCW

9.94A.530(2), (3). Aside from four factors listed in RCW 9.94A.530(2) that may be considered and imposed by the court, aggravating factors must be found by a jury. RCW 9.94A.537(3). The aggravating factor imposed by the court in this case—that "[t]he defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the current offense"—is among those that must be found by a jury. RCW 9.94A.535(3)(n).

Because this aggravating circumstance was not enacted until 2005, Mr. Trevino— relying on RCW 9.94A.345's provision that "[a]ny sentence imposed under this chapter shall be determined in accordance with the law in effect when the current offense was committed"—argues that RCW 9.94A.535(3)(n) cannot be applied to a crime he committed in 2003.

This issue was resolved by the Washington Supreme Court in *Pillatos*. In *Pillatos*, the court observed that "[g]enerally, statutes, particularly criminal statutes, operate prospectively to give fair warning that a violation carries specific consequences. But if the changes to the statute do not alter the consequences of the crime, then there is likely no relevant lack of notice." 159 Wn.2d at 470 (citation omitted). Since all of the defendants in *Pillatos* had warning of the risk of an exceptional sentence, the sentencing system, although it proved invalid, nonetheless "gave fair notice of the risk of receiving such a sentence." *Id.* The *Pillatos* court also concluded that the statute did not even operate retroactively in the context of a criminal defendant who had not yet entered a plea

21

or been tried, because entry of the plea or the trial is the precipitating event, and "[a] statute is not retroactive merely because it applies to conduct that predated its effective date." *Id.* at 471.

The *Pillatos* court also addressed RCW 9.94A.345's provision that a sentence imposed under the SRA "shall be determined in accordance with the law in effect when the current offense was committed," and concluded that it did not bar application of the 2005 legislation to crimes committed before its enactment. The court pointed out that RCW 9.94A.345 was enacted in response to its decision in *State v. Cruz*, 139 Wn.2d 186, 985 P.2d 384 (1999) with the express legislative intent of overruling *Cruz*, at least prospectively, and making clear that defendants had no vested rights in prior, more lenient law. By contrast, the court reasoned, because "both past and present law allows for exceptional sentencing[, t]he *'law in effect when the current offense was committed,'* *reasonably read, includes the possibility of exceptional sentences*" with the result that the mere change in sentencing procedure "does not violate the letter or purpose of RCW 9.94A.345." *Pillatos*, 159 Wn.2d at 473 (emphasis added).

While the "abuse of trust" aggravating factor set forth in RCW 9.94A.535(3)(n) was not added until 2005, the common law recognized abuse of trust as a factor on which a trial court could base an exceptional sentence. The only difference between RCW 9.94A.535(3)(n) and prior common law is that the statutory aggravating factor applies only if the defendant uses the position of trust to facilitate the crime, whereas the

22

common law applied more broadly. 11A WASHINGTON PRACTICE: WASHINGTON

PATTERN JURY INSTRUCTIONS: CRIMINAL 300.23 cmt. at 728-29 (3d ed. 2008); *compare*

RCW 9.94A.535(3)(n) *with State v. Chadderton*, 119 Wn.2d 390, 398, 832 P.2d 481

(1992) ("[W]e hold that a reckless abuse of trust may properly justify an enhanced

sentence regardless of whether the defendant used a position of trust to facilitate the

commission of the crime.").

*Pillatos* is controlling. The trial court was authorized to rely upon statutes adopted

in 2005 to impose an exceptional sentence for a crime committed in 2003.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the

Washington Appellate Reports but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Fearing, J.

23